# Illinois Official Reports

## Supreme Court

---

### *Matthews v. Chicago Transit Authority*, 2016 IL 117638

---

| | |
|---|---|
| Caption in Supreme Court: | JERRY MATTHEWS *et al.*, Appellees and Cross-Appellants, v. CHICAGO TRANSIT AUTHORITY *et al.* (Retirement Plan for Chicago Transit Authority Employees *et al.*, Appellants and Cross-Appellees). |
| Docket Nos. | 117638, 117713, 117728 cons. |
| Filed | May 5, 2016 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Franklin U. Valderrama, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part. Cause remanded. |
| Counsel on Appeal | J. Timothy Eaton and Elizabeth E. Babbitt, of Taft Stettinius & Hollister LLP, Katherine S. Paulson, Elliott M. Bacon, Alexander S. Vesselinovitch and Daniel J. Polatsek, of Katten Muchin Rosenman LLP, Richard W. Burke and Aaron H. Stanton, of Burke, Warren, MacKay & Serritella, P.C., and James D. O'Connell, all of Chicago, and David R. Godofsky, of Alston & Bird, LLP, of Washington, DC, for appellants Retirement Plan *et al*. |
| | J. Peter Dowd, Justin J. Lannoye, George A. Luscombe III and Elizabeth L. Rowe, all of Dowd, Bloch, Bennett & Cervone, of Chicago, for appellants Jerry Matthews *et al*. |

James P. Daley, David M. Novak and James D. Thomas, of Jackson Lewis P.C., and Karen G. Seimetz, Stephen L. Wood, and Rachel L. Kaplan, all of Chicago, for appellant Chicago Transit Authority.

Roger Huebner, of Springfield, and Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Jane Elinor Notz, Myriam Zreczny Kasper and Sara K. Hornstra, of counsel), for *amicus curiae* Illinois Municipal League *et al*.

Joseph M. Gagliardo, Thomas S. Bradley and Lawrence Jay Weiner, of Laner Muchin, LTD., of Chicago, for *amicus curiae* Northeast Regional Commuter Railroad Corporation.

Justices

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Thomas, Kilbride, and Burke concurred in the judgment and opinion.

Justice Theis specially concurred, with opinion, joined by Justice Karmeier.

Justice Karmeier specially concurred, with opinion.

**OPINION**

¶ 1 At issue in this appeal is the enforceability of plaintiffs' rights to retiree health care benefits as set forth in the 2004 collective bargaining agreement (CBA) between the Chicago Transit Authority (CTA) and Amalgamated Transit Union Locals 241 and 308 (collectively, the Transit Unions), the labor unions that represented CTA's bus and rail employees for purposes of collective bargaining. After the 2004 CBA expired, the retiree health care benefits were the subject of an interest arbitration award. That award, which modified the retiree health care benefits, was accepted by the CTA and the Transit Unions. Plaintiffs brought suit to challenge the implementation of that award.

¶ 2 Plaintiffs filed a putative class action complaint asserting claims for breach of contract, promissory estoppel, breach of fiduciary duty, and declaratory relief. In addition, plaintiffs claimed that the terms of the arbitration award modifying the retiree health care benefits were unenforceable because they violate article XIII, section 5, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. XIII, § 5), commonly referred to as the pension protection clause.

¶ 3 The circuit court of Cook County ruled that the retired CTA employees had standing to challenge the modifications to their retiree health care benefits, but the current CTA employees lacked standing to assert that challenge. On the merits, the circuit court dismissed the complaint in its entirety for failure to state a claim upon which relief could be granted.

¶ 4    Plaintiffs appealed, and the appellate court affirmed in part and reversed in part. 2014 IL App (1st) 123348. The appellate court upheld the circuit court's ruling that the current CTA employees lacked standing but held that the CTA retirees had a vested right to receive the retiree health care benefits that were provided in the prior CBA and had stated a claim for breach of that contract. The appellate court also held that the retired CTA employees were entitled to pursue their claims for promissory estoppel against the CTA.

¶ 5    Defendants brought this appeal, seeking reversal of the lower courts' rulings with respect to the standing of the CTA retirees and the sufficiency of their claims for breach of contract and promissory estoppel. Plaintiffs cross-appeal, arguing that the lower courts erred in ruling that the current employees lack standing to challenge the health care modifications. For the reasons that follow, the judgment of the appellate court is affirmed in part and reversed in part, and the cause is remanded for further proceedings.

¶ 6                                    BACKGROUND

¶ 7    The individual plaintiffs are five current and retired employees of the CTA who began working for the CTA prior to 2001. In their complaint, they seek to bring claims on behalf of themselves and two putative classes. Plaintiff Jerry Williams retired in 2006 and seeks to represent a class of retirees (Class I) who were hired before September 5, 2001, and retired before January 1, 2007. The remaining plaintiffs seek to represent a class of CTA employees and retirees (Class II) who were hired before September 5, 2001, and retired after January 1, 2007, or remain current employees of the CTA. These plaintiffs include Jerry Matthews and Tommy Sams, who are alleged to be current employees of the CTA, and Cynthia Boyne and Charles Brown, who retired after January 1, 2007. Each class purportedly consists of more than 7000 people.

¶ 8    Defendants are the CTA, the Retirement Plan for CTA Employees, the Board of Trustees of the Retirement Plan for CTA Employees, the Retiree Health Care Trust, and the Board of Trustees of the Retiree Health Care Trust.

¶ 9    The CTA is a "political subdivision, body politic and municipal corporation" created in 1945 by the Metropolitan Transit Authority Act (70 ILCS 3605/3 (West 2010)). The Retirement Plan for CTA Employees (Retirement Plan) is the entity established by section 22-101 of the Illinois Pension Code (40 ILCS 5/22-101 (West 2010)) to provide specified retirement benefits to retired CTA employees, which are set forth in a Retirement Plan Agreement. The Board of Trustees of the Retirement Plan (Retirement Plan Board) was established on January 18, 2008, by section 22-101(b) of the Pension Code (40 ILCS 5/22-101(b) (West 2010)) to administer the Retirement Plan. The Retiree Health Care Trust (Health Trust) was established on January 18, 2008, by section 22-101B(b) of the Pension Code (40 ILCS 5/22-101B(b) (West 2010)) to provide health care benefits to CTA retirees. The Board of Trustees of the Health Trust (Health Trust Board) was established on January 18, 2008, by section 22-101B(b)(1) of the Pension Code (40 ILCS 5/22-101B(b)(1) (West 2010)) to administer the Health Trust.

¶ 10   The CTA employs both union and nonunion employees, including members of the Transit Unions, which collectively bargain with the CTA regarding employee wages, working conditions, and retirement benefits. The CBAs between the CTA and the Transit Unions consist of a series of Wages and Working Conditions Agreements (WWCAs), each of which is

subject to periodic modification through collective bargaining. Two such WWCAs are at issue in this case. The 2004 WWCA became effective January 1, 2004, with a term extending through December 31, 2006. The 2007 WWCA became effective January 1, 2007, with a term extending through December 31, 2011.

¶ 11 Section 19.2 of the 2004 WWCA includes a provision allowing for modification of its terms, stating: "Either of the parties hereto shall have the right to open this Agreement for modifications and[/]or additions to be effective January 1, 2007, or any anniversary date thereafter by written notice to the other party sixty (60) days prior to such anniversary date." Section 19.2 further provides: "All conditions of this Agreement are to continue in full force and effect until changed, revised or amended from time to time by agreement of the parties or by the decision of the Board of Arbitration." Section 20.2 of the 2007 WWCA has identical language, except that the effective date of modifications is "January 1, 2012, or any anniversary date thereafter."

¶ 12 Incorporated into each WWCA is the Retirement Plan Agreement, a contract concerning retirement benefits that was first agreed to by the CTA and the Transit Unions in 1949. Article 18 of both the 2004 and 2007 WWCAs provides that the Retirement Plan Agreement is incorporated in full into the WWCA "in all respects and for all purposes, including future proposals for revision in the Plan and in the negotiation or arbitration of proposed revisions." Correspondingly, the Retirement Plan Agreement provides that it "is part of the Wage[s] and Working Conditions Agreement between the parties hereto. This Agreement can be changed only in accordance with the provisions of the aforesaid Wage[s] and Working Conditions Agreement." Collectively, the WWCA and the Retirement Plan Agreement constitute the CBA.

¶ 13 Prior to May 16, 1980, the CTA contributed up to $40 per retiree per month toward the retiree's health insurance premium. On May 16, 1980, an arbitration panel chaired by Harry J. Dworkin issued an interest arbitration award[1] (the Dworkin award), which ordered the Retirement Plan Agreement to be amended. Regarding one such amendment, the award stated: "Effective [upon] the issuance of the Award, the [Chicago Transit] Authority will no longer contribute up to $40.00 per month toward the retiree's Group Hospital Surgical premium." Instead, the award ordered the Retirement Plan to pay up to $60 per month toward the retiree's Group Hospital Surgical premium until January 1, 1981, when the Retirement Plan would pay up to $75 per month.

¶ 14 The retiree health care benefit was added to the Retirement Plan Agreement in 1980 as a new section 20.12. Section 20.12(a) of the Retirement Plan Agreement, as amended through December 31, 2003, provides:

"(a) Effective December 1, 1989, a sum will be paid in an amount sufficient to provide insurance coverage for all retirees under the Group Hospital Surgical Major Medical Plan or the Health Maintenance Organization premium, but said sum shall not exceed the premium cost to the [Retirement] Plan effective for such coverage for a retiree on December 31, 2003. This benefit terminates when the retiree attains age 65."

---

[1]According to the complaint, "[a] proceeding that relates to terms of the CBA applicable to multiple employees or employees as a group, rather than to a single employee's grievance, is called an 'Interest Arbitration.' "

¶ 15 In 2006, the Transit Unions and the CTA met to negotiate the extension of the 2004 CBA and changes to its terms. They were unable to reach agreement and, in 2007, submitted their dispute for interest arbitration. On June 26, 2007, an arbitration panel chaired by Edwin Benn issued an opinion and award (the Benn award), which noted that the "Pension Fund and retiree health insurance [are] in dire financial straits and in desperate need of major additional funding." The award stated that the parties agreed that the jurisdiction of the panel to issue an arbitration award was "expressly conditioned upon the passage into law of legislation which contains substantially the terms and conditions set forth in the attached Exhibit A."

¶ 16 Exhibit A, in a section titled "Retiree Health Care," provided for creation of the Health Trust and its board. This section further provided for a bond to fund $450 million in "seed" money to the Health Trust, conditioned on the parties' compliance with certain terms, including: (1) that retired employees contribute up to 45% of the total amount expended under the Retirement Plan for health care; (2) that current employees pay a "payroll tax" contribution equal to 3% of compensation; and (3) that the Health Trust "shall take sole responsibility for payment, claims and plan administration effective January 1, 2009." Exhibit A also included a section titled "Pension" and a final section stating: "All of the above [is] contingent on appropriate Legislative Funding."

¶ 17 Public Act 95-708, titled "An Act concerning transportation," became effective on January 18, 2008. As relevant to the case at bar, Public Act 95-708 amended section 22-101 of the Pension Code and added section 22-101B. The amended section 22-101 concerned the Retirement Plan. Section 22-101(h) provided, in pertinent part:

"The changes made by this amendatory Act of the 95th General Assembly, to the extent that they affect the rights or privileges of Authority employees that are currently the subject of collective bargaining, have been agreed to between the authorized representatives of these employees and of the Authority prior to enactment of this amendatory Act, as evidenced by a Memorandum of Understanding between these representatives that will be filed with the Secretary of State Index Department and designated as '95-GA-C05.' " 40 ILCS 5/22-101(h) (West 2008).

¶ 18 The Memorandum of Understanding, which was signed by representatives of the CTA and the Transit Unions, provided that "[t]he parties acknowledge that the Legislation, if passed into law, is legislation containing substantially the terms and conditions set forth in Exhibit A to Arbitrator Benn's June 26, 2007[,] Opinion and Award and the parties' clarifications thereto." The memorandum further stated:

"The parties further acknowledge their intention that the Legislation not be construed as a diminution of the rights, privileges and benefits under the existing CBAs between them or of Arbitrator Benn's June 26, 2007[,] Opinion and Award, including but not limited to the parties' exercise of their right to grant ad hoc increases to retirees in accordance with the parties' past practice."

¶ 19 The new section 22-101B, titled "Health Care Benefits," provided:

"The [CTA] *** shall take all actions lawfully available to it to separate the funding of health care benefits for retirees and their dependents and survivors from the funding for its retirement system. The [CTA] shall endeavor to achieve this separation as soon as

possible, and in any event no later than July 1, 2009." 40 ILCS 5/22-101B(a) (West 2008).[2]

It also established the Health Trust "for the purpose of providing health care benefits to eligible retirees and their dependents and survivors in accordance with the terms and conditions set forth in this Section 22-101B" and provided that the Health Trust "shall be solely responsible for providing health care benefits to eligible retirees and their dependents and survivors by no later than July 1, 2009, but no earlier than January 1, 2009." 40 ILCS 5/22-101B(b) (West 2008).

¶ 20 Section 22-101B further provided that, beginning January 1, 2009, "the aggregate amount of retiree, dependent and survivor contributions to the cost of their health care benefits shall not exceed more than 45% of the total cost of such benefits." 40 ILCS 5/22-101B(b)(5) (West 2008). Additionally, section 22-101B included a requirement that "all employees of the [CTA] shall contribute to the [Health Trust] in an amount not less than 3% of compensation." 40 ILCS 5/22-101B(6) (West 2008).

¶ 21 Finally, section 22-101B stated:

"(7) No earlier than January 1, 2009[,] and no later than July 1, 2009[,] as the [Health Trust] becomes solely responsible for providing health care benefits to eligible retirees and their dependents and survivors in accordance with subsection (b) of this Section 22-101B, the [CTA] shall not have any obligation to provide health care to current or future retirees and their dependents or survivors." 40 ILCS 5/22-101B(b)(7) (West 2008).

¶ 22 Public Act 95-708 also added section 12c to the Metropolitan Transit Authority Act, which permitted the CTA to issue certain bonds and notes, more than $500 million of which was to be deposited into the Health Trust for retiree health care. 70 ILCS 3605/12c(b)(2) (West 2008).

¶ 23 On or about February 27, 2009, the Health Trust Board instituted a health insurance "plan design" that required CTA retirees hired before September 5, 2001, to pay 45% of the total cost of their retiree health care benefits. Since July 2009, retirees have been paying a portion of the cost of those benefits. The Health Trust Board began levying a 3% payroll tax on current employees in July 2009.

¶ 24 Plaintiffs subsequently filed a nine-count class action complaint, challenging the modifications to their health care benefits that were implemented following the enactment of Public Act 95-708 (eff. Jan. 18, 2008).

¶ 25 Counts I and V of the complaint, against all defendants, alleged a violation of article XIII, section 5, of the Illinois Constitution based on the claim that the retiree health care benefits constitute " 'an enforceable contractual relation[ship], the benefits of which shall not be diminished or impaired' " (quoting Ill. Const. 1970, art. XIII, § 5). Counts II and VI, against the CTA and the Retirement Plan, asserted claims for breach of contract based on the CBAs entered into between the CTA and the Transit Unions.

---

[2]This provision was originally enacted as article 15, section 15-5, of Public Act 94-839 (eff. June 6, 2006), which amended section 22-101 of the Pension Code. As of January 18, 2008, this provision was deleted from section 22-101 and was included in the new section 22-101B. With that enactment, the funding-separation deadline was extended from January 1, 2009, to July 1, 2009.

¶ 26 Counts III and VII, against the CTA and the Retirement Plan, alleged claims for promissory estoppel. Those counts asserted that the CTA and the Retirement Plan made a number of promises to plaintiffs, including that plaintiffs would receive fully paid retiree health care benefits identical to those of current CTA employees. They further asserted that plaintiffs relied on these promises to their detriment and their reliance was expected and foreseeable.

¶ 27 Counts IV and VIII, against the Retirement Plan Board and the Health Trust Board, alleged breach of fiduciary duty.[3] Count IX, against all defendants, sought a declaratory judgment on the basis that plaintiffs have a legal interest in enforcing past and present CBAs, as well as the right to collective bargaining in the future, while defendants have contrary interests.

¶ 28 As relief, plaintiffs requested: (1) certification of Classes I and II; (2) a declaration that certain parts of Public Act 95-708 are void and unenforceable because they violate article XIII, section 5, of the Illinois Constitution and the Regional Transportation Authority Act (RTA Act) (70 ILCS 3615/1.01 *et seq.* (West 2010)); (3) a declaration that a 2007 arbitration award is "null and void" as to plaintiffs because the terms of the arbitration award were not adopted in Public Act 95-708; (4) a preliminary and permanent injunction against enforcement of certain parts of Public Act 95-708 and a requirement that defendants reinstate plaintiffs' rights as they existed prior to the enactment of Public Act 95-708, including the rights of retired CTA employees to fully paid health care benefits at the same level as those of current CTA employees; and (5) compensatory damages, costs, and attorney fees.

¶ 29 The Retirement Plan, the Retirement Plan Board, the Health Trust, and the Health Trust Board (collectively, the Plan and Trust defendants) filed a combined motion to dismiss plaintiffs' class action complaint pursuant to sections 2-615 and 2-619(a)(9) of the Code of Civil Procedure (Code) (735 ILCS 5/2-615, 2-619(a)(9) (West 2010)). The Plan and Trust defendants claimed the complaint should be dismissed under section 2-615 because (1) the unambiguous language of the Retirement Plan Agreement proves that plaintiffs do not have a vested right to free lifetime retiree health care benefits, so the entire complaint fails; (2) the CTA and the Transit Unions had the right to change retiree health care benefits, so the breach of contract claims fail; (3) plaintiffs could not rely on statements outside the Retirement Plan Agreement, so the promissory estoppel claims fail; (4) complying with Public Act 95-708 does not constitute a breach of fiduciary duty, so the breach of fiduciary duty claims fail; and (5) because plaintiffs failed to allege a substantive cause of action, the request for declaratory judgment fails. The Plan and Trust defendants further claimed the complaint should be dismissed under section 2-619(a)(9) because the Transit Unions are the only entities with standing to challenge modifications in retiree health care benefits resulting from collective bargaining.

¶ 30 The CTA filed a combined motion to dismiss the complaint pursuant to sections 2-615 and 2-619(a)(9). The CTA claimed the counts directed at it should be dismissed because (1) the CTA is not a proper party because it has not had any responsibility to pay any portion of retired CTA employees' health care costs since the 1980s; (2) plaintiffs do not have a vested right to free lifetime retiree health care; and (3) plaintiffs failed to state a cause of action. The CTA also claimed that plaintiffs do not have standing to challenge their health care benefits.

---

[3]Counts IV and VIII, alleging breach of fiduciary duty, are not at issue here.

- 7 -

¶ 31	The circuit court entered an order granting defendants' section 2-619(a)(9) motions with regard to the current CTA employees, finding that they lacked standing to challenge the modification of their health care benefits. However, the court denied the 2-619(a)(9) motions with regard to the CTA retirees, concluding they have standing to challenge the changes in their health care benefits.

¶ 32	The court also granted defendants' section 2-615 motions, with prejudice, and dismissed the complaint in its entirety. With regard to the CTA, the circuit court found that the Dworkin award, as well as Public Act 95-708, established that the CTA did not have any duty to pay for retiree health care benefits.

¶ 33	Regarding the Plan and Trust defendants, the court concluded that the retiree health care benefits were not vested. The court pointed to portions of the Retirement Plan Agreement, indicating that it provided for vesting of lifetime pension benefits, and noted that similar language was not employed for health care benefits. The court concluded this "strongly implies that the parties did not intend to vest retirees with health care benefits." The circuit court also concluded that the "more fatal flaw" to plaintiffs' claim was the inclusion of language in the CBA that allowed the parties to modify the terms of that agreement, through collective bargaining, upon its expiration. In the circuit court's view, this provision demonstrated that the health care benefits could be altered and were not vested.

¶ 34	The appellate court affirmed in part and reversed in part. 2014 IL App (1st) 123348, ¶¶ 1, 155. The court affirmed the dismissal of all current CTA employees' claims for lack of standing. *Id.* ¶¶ 76, 154. However, the appellate court reversed as to the vesting of retired CTA employees' health care benefits, concluding, contrary to the circuit court, that retirees have a vested right to those benefits. *Id.* ¶¶ 108, 122.

¶ 35	In addition, the appellate court affirmed the dismissal of the retired CTA employees' breach of contract claim against the CTA, their promissory estoppel claim against the Retirement Plan, and their breach of fiduciary duty claims against the Retirement Plan Board and the Health Trust Board. *Id.* ¶¶ 82, 85-86, 136, 149. The court reversed the dismissal of the retired CTA employees' breach of contract claim against the Retirement Plan, their promissory estoppel claim against the CTA, and their claim for declaratory judgment against all defendants. *Id.* ¶¶ 130-31, 138, 152. The court also reversed the dismissal of the retired CTA employees' constitutional claim, based on section 5 of article XIII, and remanded the matter for further proceedings. *Id.* ¶¶ 128, 154-55.

¶ 36	The Retirement Plan and the Health Trust filed a petition for leave to appeal in case No. 117638[4]; the CTA filed a petition for leave to appeal in case No. 117728; and plaintiffs, as cross-appellants, filed a petition for leave to appeal in case No. 117713. On September 24, 2014, we allowed the petitions for leave to appeal and consolidated the cases. See Ill. S. Ct. R. 315(a) (eff. July 1, 2013). In addition, we allowed the Illinois Municipal League and the City of Chicago to file an *amici curiae* brief in support of appellants, the Chicago Transit Authority Trade Union Coalition to file an *amicus curiae* brief in support of appellants, and the Northeast Illinois Regional Commuter Railroad Corporation to file an *amicus curiae* brief in support of

---

[4]On June 4, 2014, we allowed the Retirement Plan Board and the Health Trust Board to join this petition for leave to appeal.

the CTA. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 37                                        ANALYSIS
¶ 38                                        Standing
¶ 39     We initially consider whether plaintiffs' claims were subject to dismissal under section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2010)) for lack of standing. The doctrine of standing ensures that issues are raised only by those parties who have a sufficient stake in the outcome of the controversy. *Glisson v. City of Marion*, 188 Ill. 2d 211, 221 (1999); *People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 482 (1992). Our review of a trial court's decision on a motion to dismiss that is based upon lack of standing is *de novo*, and we consider whether dismissal was proper as a matter of law. *Lyons v. Ryan*, 201 Ill. 2d 529, 534 (2002); *Glisson*, 188 Ill. 2d at 220-21.

¶ 40     This action was brought by five individual plaintiffs on behalf of themselves and as representatives of two putative classes. In Class I, Williams represents former employees who were members of Amalgamated Transit Union Local 308 and retired under the 2004 CBA. In Class II, Matthews represents current employees who are members of Amalgamated Transit Union Local 308 (train workers), Sams represents current employees who are members of Amalgamated Transit Union Local 241 (bus workers), Boyne represents former employees who were members of the International Brotherhood of Electrical Workers Local 9 and retired under the 2007 CBA, and Brown represents former employees who were not union members and retired under the 2007 CBA.

¶ 41     The Plan and Trust defendants have argued that all of the plaintiffs lack standing because they were represented by the Transit Unions during the collective bargaining process that resulted in the Benn award and the enactment of Public Act 95-708, which were implemented through the modification of retiree health care benefits under the 2007 CBA. The circuit court determined that Matthews, Sams, Boyne, and Brown, who represent the Class II plaintiffs, lack standing to challenge the enforceability of the 2007 CBA. However, the circuit court determined that Williams, who represents the Class I plaintiffs, has standing to challenge its enforceability. The appellate court agreed that the Class II plaintiffs lack standing but did not address the standing of Williams or the Class I plaintiffs because that issue was not raised by defendants in that appeal.

¶ 42     Before this court, Williams contends that the question of his standing has been forfeited because defendants failed to raise it in the appellate court. We disagree. It is established that " '[w]here the trial court is reversed by the Appellate Court and the appellee in that court brings the case here for further review, he may raise any questions properly presented by the record to sustain the judgment of the trial court, even though those questions were not raised or argued in the Appellate Court.' " *Dineen v. City of Chicago*, 125 Ill. 2d 248, 264 (1988) (quoting *Mueller v. Elm Park Hotel Co.*, 391 Ill. 391, 399 (1945)); see also *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430-31 (2006). In this case, the circuit court dismissed the complaint in its entirety, and the appellate court reversed the dismissal of certain claims asserted by Williams. The Plan and Trust defendants may properly raise any arguments to sustain the trial court's judgment, as long as those arguments are supported by the record. Accordingly, we will address the argument that Williams lacks standing in turn.

¶ 43    With regard to the claims of Matthews, Sams, Boyne, Brown, and the other members of the purported Class II, the complaint acknowledges that "[t]he Transit Unions are collective bargaining representatives of certain active CTA employees." It is established that only parties to a CBA may dispute an arbitration award in court. *Stahulak v. City of Chicago*, 184 Ill. 2d 176, 180 (1998). Thus, only the employer and the designated representative of the bargaining unit may bring suit to challenge an arbitration award in circuit court. *Id.*; *Casanova v. City of Chicago*, 342 Ill. App. 3d 80, 89 (2003); see also 5 ILCS 315/16 (West 2012) (providing that, after exhaustion of mandatory arbitration or other grievance procedures, suits alleging violations of CBAs "between a public employer and a labor organization representing public employees may be brought by the parties to such agreement").

¶ 44    Here, the 2007 CBA provides that the CTA recognizes the transit union as the sole and exclusive collective bargaining agent for the employees in the bargaining unit.[5] An individual member of a collective bargaining unit may bring suit against an employer to challenge an arbitration award only if the court finds that the union, as bargaining agent, breached its duty of fair representation. *Cosentino v. Price*, 136 Ill. App. 3d 490, 495 (1985). The complaint in this case contains no such allegation. Accordingly, the Class II plaintiffs were represented by the Transit Unions during the bargaining and arbitration process that resulted in the 2007 CBA.[6] Because the claims of the Class II plaintiffs attack the modification of health care benefits resulting from an arbitration award to which their exclusive bargaining agent was a party, those plaintiffs lack standing. See *Stahulak*, 184 Ill. 2d at 180-81.

¶ 45    With regard to the claims of Williams and the members of Class I, the complaint alleges that "[r]etirees, even those formerly represented by the Transit Unions, are not represented by the Transit Unions in collective bargaining, cannot vote on proposed collective bargaining agreements, and cannot participate in arbitration proceedings between the Transit Unions and the CTA to determine the terms to be included in a new collective bargaining agreement." The terms of the 2004 CBA establish that the CTA recognized the Transit Unions as "the sole and exclusive collective bargaining agents for all of its employees." Following expiration of that agreement, however, Williams and the Class I retirees were no longer employed by the CTA and were not represented in the subsequent collective bargaining and interest arbitration proceedings.[7]

---

[5]The complaint alleges that the "Transit Unions and the CTA entered into another 'Wages and Working Conditions Agreement,' " which took effect on January 1, 2007. This allegation cites to Exhibit 3 attached to the complaint, which is a copy of the 2007 agreement between the CTA and Local 241. That document states that the CTA "recognizes Local 241 as the sole and exclusive bargaining agents [*sic*] for all of its employees." Local 308 is not referenced in the exhibit, but none of the parties have claimed that the members of that transit union are not bound by its terms.

[6]Though Boyne was a member of another union and Brown was not a member of any union, the appellate court noted that the plaintiffs "did not argue that CTA employees who are not members of the transit unions are treated differently than union members," and any argument about nonunion employee standing was not raised until the plaintiffs' rehearing petition below. 2014 IL App (1st) 123348, ¶ 68 n.6. Therefore, that argument has been forfeited.

[7]There is no merit to the Plan and Trust defendants' argument that the definition of the term "employee" in the Retirement Plan Agreement necessarily means that retirees were represented during the collective bargaining over the 2007 CBA. The plan states that "retired employees are not included" in its definition of "employee," except as provided in section 20. Section 20 relates to "Present

¶ 46     That fact is consistent with Illinois law. The Illinois Public Labor Relations Act (the Act) defines "[p]ublic employee" as "any individual employed by a public employer." 5 ILCS 315/3(n) (West 2012). In addition, the Act allows public employees "to bargain collectively through representatives of their own choosing on questions of wages, hours and other conditions of employment." 5 ILCS 315/6(a) (West 2012). Accordingly, individuals who are not public employees do not have a right to collective bargaining. See *Carnock v. City of Decatur*, 253 Ill. App. 3d 892, 899 (1993) ("a union has no obligation to represent retirees, who are outside the collective-bargaining unit"); see also *Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., Chemical Division*, 404 U.S. 157, 172 (1971) (holding that retirees are not "employees" covered by the collective-bargaining provisions of the National Labor Relations Act).[8] Because retirees are not represented in collective bargaining, they have standing to pursue claims for enforcement of benefits granted under a CBA. *Pittsburgh Plate Glass*, 404 U.S. at 181 n.20; *Carnock*, 253 Ill. App. 3d at 898 (holding that a retiree need not exhaust contractual remedies before filing suit to enforce a benefit provision of a CBA); see also *Poole v. City of Waterbury*, 831 A.2d 211, 227-30 (Conn. 2003).

¶ 47     In asserting that Williams lacks standing, the Plan and Trust defendants rely upon "the sworn factual record" in another case involving a CTA retiree who was a member of a transit union. In particular, the Plan and Trust defendants refer to two affidavits submitted in the "[b]riefing" of that case. According to defendants, those affidavits show that the Transit Unions advocated for retirees during collective bargaining. Even if that circumstance is true, it does not alter the fact that retirees are not part of the bargaining unit and generally are not represented by unions.

¶ 48     The Plan and Trust defendants also refer to another document submitted in the "[b]riefing" of that case: a "Beneficiary Designation Form," signed by all CTA employees upon enrolling in the retirement plan. Under its terms, CTA employees purportedly agree to the provisions of the plan and also to "any future duly authorized Amendments made thereto hereafter." That form is not before us, and there is nothing in the record indicating that Williams signed it.[9]

---

Pensioners" and the relevant portion of that section contains two references to "employees." The first refers to employees hired before September 1, 2001, who "upon retirement" receive the hospitalization supplement provided by the Plan; the second refers to employees hired after that date who do not receive the supplement "upon retirement." These two references do not indicate that retirees are considered to be employees for purposes of collective bargaining. To the contrary, those references merely address the circumstance that some employees may reach retirement in the future, when they will become retirees and either will or will not be granted the hospitalization supplement. Nothing in the plan contradicts the contract language stating that only current employees are represented by the designated agent for purposes of collective bargaining.

[8]Because there is a close parallel between the Act and the National Labor Relations Act, it is appropriate to consider federal labor law decisions when they are consistent with the purposes of the Act. See *City of Burbank v. Illinois State Labor Relations Board*, 128 Ill. 2d 335, 345 (1989).

[9]In a similar vein, the *amicus curiae* brief filed by the Chicago Transit Authority Trade Union Coalition states that "many" of its member unions permit retired members to vote in officer elections and that "at least one" of the unions also permits retired members to vote on contracts. Yet, the Coalition's brief does not indicate whether the Transit Unions here allow retirees to ratify contracts. We must assume that Williams and the Class I plaintiffs did not do so.

¶ 49    Though a union is under no obligation to represent the interests of retirees in collective bargaining, it may choose to do so if the retirees agree to such representation. See *Rossetto v. Pabst Brewing Co.*, 128 F.3d 538, 540 (7th Cir. 1997). Here, there is nothing in the complaint or its attachments to indicate that Williams agreed to union representation in the negotiation and arbitration of the 2007 CBA. On this record, we must conclude that the Transit Unions did not represent Williams or the other Class I retirees during the collective bargaining process that resulted in the Benn award and the 2007 CBA. Consequently, Williams has standing to pursue his claims against defendants on behalf of himself and a class of employees who were hired before September 5, 2001, and retired under the 2004 CBA.

¶ 50                                Vesting of Retiree Health Care Benefits

¶ 51    We next consider Williams's argument that the health care benefits provided to CTA retirees in the 2004 CBA were vested rights that could not be diminished or impaired through the collective bargaining process. The circuit court rejected this argument, finding that the 2004 CBA's provision of retiree health care benefits was subject to modification when that agreement expired. Consequently, the circuit court dismissed all of Williams's claims on the ground that they failed to assert claims on which relief could be granted (735 ILCS 5/2-615 (West 2012)).

¶ 52    The appellate court reversed that ruling and held that, under the language of the 2004 CBA, the retiree health care benefits were vested. 2014 IL App (1st) 123348, ¶¶ 99-122. In reaching this conclusion, the appellate court did not address the applicability of the pension protection clause (*id.* ¶ 124), but applied a presumption in favor of vesting that had been adopted by our appellate court and by reviewing courts in other jurisdictions. *Id.* ¶¶ 99-104 (citing *Marconi v. City of Joliet*, 2013 IL App (3d) 110865, ¶¶ 24-38; *Roth v. City of Glendale*, 2000 WI 100, ¶¶ 26-29, 33, 35-36, 237 Wis. 2d 173, 614 N.W.2d 467; *International Union, United Automobile, Aerospace, & Agricultural Implement Workers of America v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983)). The reasoning employed by the appellate court has since been overruled by the United States Supreme Court. See *M&G Polymers USA, LLC v. Tackett*, 574 U.S. ___, ___, 135 S. Ct. 926, 935 (2015) (rejecting the presumption in favor of vesting as inconsistent with ordinary principles of contract law). Accordingly, we review the legal question of whether the circuit court erred in dismissing the claims asserted by Williams, as representative of the Class I plaintiffs, in light of the pension protection clause and without applying a presumption in favor of vesting.

¶ 53    A motion to dismiss under section 2-615 challenges the legal sufficiency of a complaint. *Kanerva v. Weems*, 2014 IL 115811, ¶ 33. In ruling on such a motion, a court must accept as true all well-pleaded facts in the complaint, as well as any reasonable inferences that may arise from them. *Id.* The essential question is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted. *Id.* A cause of action should not be dismissed under section 2-615 unless it is clearly apparent from the pleadings that no set of facts can be proven that would entitle the plaintiff to recover. *Id.* Our review of an order granting a section 2-615 motion to dismiss is *de novo*. *Id.* Also, because resolution of this issue requires us to determine the applicability and effect of the pension protection clause and to interpret the relevant CBA

provisions, our review is *de novo*. *Hawthorne v. Village of Olympia Fields*, 204 Ill. 2d 243, 254-55 (2003); *Carr v. Gateway, Inc.*, 241 Ill. 2d 15, 20 (2011).

¶ 54     Article XIII, section 5, of the Illinois Constitution provides that "[m]embership in any pension or retirement system of the State, any unit of local government *** or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." Ill. Const. 1970, art. XIII, § 5. In *Kanerva*, we held, as a matter of first impression, that the plain meaning of this clause demonstrates that it protects all of the benefits that flow from the contractual relationship arising from membership in a public retirement system. *Kanerva*, 2014 IL 115811, ¶ 38. We also held that, because retiree health care benefits provided by statute to state employees are benefits of membership in a public retirement system, they are constitutionally protected from unilateral diminishment or impairment through legislative action. *Id.* ¶ 40. In *In re Pension Reform Litigation*, 2015 IL 118585 (hereinafter referred to as *Heaton*), we held that the State's police power could not be used to justify legislation that effected a unilateral reduction of State retirement annuity benefits. *Id.* ¶¶ 60-75. In *Jones v. Municipal Employees' Annuity & Benefit Fund*, 2016 IL 119618, this court again held that public employees' pension benefits are constitutionally protected against diminishment through unilateral action by the General Assembly. *Id.* ¶¶ 29, 47. In doing so, the court recognized that, under ordinary contract principles, public employee pension benefits may be modified where there has been a bargained-for exchange and consideration. *Id.* ¶ 53. However, none of these cases specifically addressed enforceability of retiree health care benefits provided to public employees in a CBA or whether such benefits may be subject to modification through the collective bargaining process.

¶ 55     The Plan and Trust defendants argue that the right to retiree health care benefits provided in the 2004 CBA does not constitute a vested right, where the unambiguous language of that agreement, which incorporates the Retirement Plan Agreement, demonstrates that those benefits were subject to modification when the term of that agreement expired. Defendants further contend that the pension protection clause set forth in article XIII, section 5, does not provide any additional protection beyond that specified in the 2004 CBA.

¶ 56     Plaintiffs respond that their 2004 contractual right to retiree health care benefits is vested because it is constitutionally guaranteed by the pension protection clause. According to plaintiffs, since the right to receive retirement system benefits is vested in the individual, those benefits cannot be diminished or impaired without the individual consent of the retirement system participant. In plaintiffs' view, constitutionally protected retiree benefits are vested and, therefore, are not subject to collective waiver through the process of collective bargaining. Plaintiffs further assert that the language of the Retirement Plan Agreement, which provides that the retiree health care benefit "terminates when the retiree attains age 65," indicates the parties intended that this retirement benefit would survive the expiration of the CBA.

¶ 57     We first consider whether the pension protection clause operates to automatically vest the retirement benefits of public employees, regardless of the terms of the contract that confers those rights. As this court has observed, prior to the adoption of the 1970 constitution, Illinois adhered to the historical classification of pension plans as either mandatory or optional. *Kanerva*, 2014 IL 115811, ¶ 45; see also *People ex rel. Sklodowski v. State*, 182 Ill. 2d 220, 228 (1998). Under that classification, the benefits of an optional plan were considered to be enforceable contract rights, while the benefits of a mandatory plan were considered to be

gratuities that could be revoked at will. *People ex rel. Sklodowski*, 182 Ill. 2d at 228. The primary purpose of article XIII, section 5, was to eliminate any uncertainty surrounding the payment of public pension benefits and to clarify that state and local governments were obligated to provide pension benefits to their employees. *Id.*; *McNamee v. State*, 173 Ill. 2d 433, 440 (1996); see also *Buddell v. Board of Trustees, State University Retirement System*, 118 Ill. 2d 99, 102 (1987).

¶ 58     The pension protection clause effected a fundamental change in the characterization of mandatory pension plans by ensuring that the benefits of such plans were no longer viewed as gratuities that could be modified or eliminated at the employer's discretion. *Buddell*, 118 Ill. 2d at 102 (recognizing that section 5 of article XIII "guarantees that all pension benefits will be determined under a contractual theory"). With respect to the benefits of optional pension plans, which historically had been regarded as contractual rights, section 5 of article XIII provided protection that is essentially coextensive with that afforded all contracts under article I, section 16, of the constitution. ILCS Ann., Ill. Const. 1970, art. XIII, § 5, Constitutional Commentary, at 665 (Smith-Hurd 2006); see also *People ex rel. Sklodowski v. State*, 162 Ill. 2d 117, 147 (1994) (Freeman, J., concurring in part and dissenting in part, joined by Harrison, J.) (citing *Buddell*, 118 Ill. 2d at 102). Thus, the adoption of the pension protection clause put mandatory pension plans on par with optional plans and guaranteed that public employees' rights to retirement benefits are enforceable. *Buddell*, 118 Ill. 2d at 102.

¶ 59     Moreover, this court has consistently held that the contractual relationship protected by section 5 of article XIII is governed by the actual terms of the contract or pension plan in effect at the time the employee becomes a member of the retirement system. *Heaton*, 2015 IL 118585, ¶ 46; *People ex rel. Sklodowski*, 182 Ill. 2d at 229; *McNamee*, 173 Ill. 2d at 439; *Di Falco v. Board of Trustees of the Firemen's Pension Fund of the Wood Dale Fire Protection District No. One*, 122 Ill. 2d 22, 26 (1988); *Kerner v. State Employees' Retirement System*, 72 Ill. 2d 507, 514 (1978); see also ILCS Ann., Ill. Const. 1970, art. XIII, § 5, Constitutional Commentary, at 665 (Smith-Hurd 2006). While the pension protection clause guarantees the vested rights provided in the contract that defines a participant's retirement system membership, it does not change the terms of that contract or the essential nature of the rights it confers. Accordingly, the pension protection clause does not transform a nonvested right to retirement benefits into one that is vested.

¶ 60     Indeed, this elemental fact is reflected in the debates at the constitutional convention that preceded the adoption of article XIII, section 5. With regard to the issue of vesting, Delegate Kinney, who sponsored the provision, stated that, if a public employee begins employment under a pension statute that permits the lowering of benefits in the future, that contingency would be constitutionally permissible because it was a condition of the contract that the employee accepted. 4 Record of Proceedings, Sixth Illinois Constitutional Convention 2931 (statements of Delegate Kinney).

¶ 61     This court approved and adopted that analysis more than 30 years ago. In *Kerner*, we held that, where a public employee becomes a member of a retirement system under a statute that includes a provision which may operate to deny him benefits in the future, that provision does not become an unconstitutional impairment of his retirement benefits because he agreed to it as a condition of his membership in the system. *Kerner*, 72 Ill. 2d at 514; see also *Kraus v. Board of Trustees of the Police Pension Fund*, 72 Ill. App. 3d 833, 849-50 (1979).

¶ 62    The same conclusion necessarily holds true where an employee's membership in a public retirement system is governed by a CBA. If the underlying contract provides that certain retirement benefits may be modified in the future, then that is the contract protected by article XIII, section 5. Nothing in the pension protection clause requires or permits a court to rewrite the terms of such an agreement. See *Kerner*, 72 Ill. 2d at 514.

¶ 63    In arguing that section 5 of article XIII precludes a modification of the retiree health care benefits granted by the 2004 CBA, Williams refers to what he has termed the "vesting rules" of the pension protection clause, and he cites to our recent decision in *Kanerva* and to earlier cases holding that pension rights may not be diminished or impaired by statutory amendment. See *Kanerva*, 2014 IL 115811, ¶¶ 48, 57; *Buddell*, 118 Ill. 2d at 104-05, 106; *Felt v. Board of Trustees of the Judges Retirement System*, 107 Ill. 2d 158, 162-63 (1985). There are two fundamental flaws in this argument. First, as explained above, section 5 of article XIII does not establish any "vesting rules." Rather, it simply protects the actual contract that governs the retirement system membership.

¶ 64    Second, the cases cited by Williams were decided under an entirely different framework from that presented here. Those cases addressed the validity of changes to portions of the Pension Code, which did not include any provision allowing for the modification of benefits and also did not specify an expiration or termination date for the benefits conferred. Accordingly, our prior cases held only that retirement benefits that are defined by statute may not be unilaterally modified by legislative action. That precedent does not control here because it did not consider the validity of a change in benefits that was achieved through the collective bargaining process or where the underlying contract permitted the modification of benefits. This distinction is of critical importance, given the divergent means by which public retirement benefits are determined and conferred.

¶ 65    For those public servants whose employment is not governed by a contract, the agreement that controls their membership in a retirement system consists of the relevant provisions in the Pension Code that define the rights and obligations that arise from that membership. See *People ex rel. Sklodowski*, 182 Ill. 2d at 229; *Buddell*, 118 Ill. 2d at 104-05; *Felt*, 107 Ill. 2d at 162-63. In that circumstance, the General Assembly determines what retirement benefits will be granted, and the employees receive the benefits that are conferred by that legislative action. Because the retirement benefits of these employees are not governed by a separate contract, and because Illinois law generally presumes that statutes do not create private contractual rights (*People ex rel. Sklodowski*, 182 Ill. 2d at 231-32; *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 105 (1990)), the pension protection clause guarantees the contractual relationship and the benefits that flow from their retirement system membership. This is true whether the statute allows for modification or not.

¶ 66    For those public servants whose employment is governed by a contract, such as a CBA, the pension protection clause guarantees the retirement benefits that are provided in their employment contract. The terms of such an agreement are subject to negotiation between the public employer and the designated collective bargaining representative and are implemented by the applicable provisions codifying the agreement in the Pension Code. If the terms of the agreement provide for vested retirement benefits, those benefits are constitutionally protected by section 5 of article XIII. However, as explained above, if the underlying contract allows for the modification of certain retirement benefits, the pension protection clause does not preclude

modification or alter the essential nature of the rights granted under the contract. Therefore, neither the language of the pension protection clause nor our prior case law presents an obstacle to a contractual provision that permits subsequent modification of public retirement benefits.

¶ 67    Williams further contends that the union did not have authority to agree to a diminishment of retiree health care benefits because a union cannot agree to a CBA provision that operates as a waiver of a constitutionally protected right. This contention is without merit. Constitutional rights can be waived or restricted by a union in a CBA. See *Cook County College Teachers Union, Local 1600 v. Board of Trustees of Community College District No. 508, County of Cook*, 134 Ill. App. 3d 489, 492 (1985) (holding that a provision in a CBA waived public employees' constitutional rights to privacy regarding information related to outside employment); *Bolden v. Southeastern Pennsylvania Transportation Authority*, 953 F.2d 807, 828 (3d Cir. 1991) (holding that a union is authorized to consent to drug testing of public employees, thereby restricting the employees' fourth amendment rights); *In re Briggs*, 635 N.Y.S.2d 687, 688 (N.Y. App. Div. 1995) (same); see also *American Postal Workers Union, Columbus Area Local v. United States Postal Service*, 871 F.2d 556, 560 (6th Cir. 1989) (recognizing that a union may consent to searches of employee lockers, as provided in a CBA).

¶ 68    In addition, a union can waive statutory and economic rights on behalf of its members. See *Ehlers v. Jackson County Sheriff's Merit Comm'n*, 183 Ill. 2d 83, 93-94 (1998) (holding that a union can waive statutory rights under Illinois Public Labor Relations Act and that the court must enforce the CBA as written); see also *Metropolitan Edison Co. v. National Labor Relations Board*, 460 U.S. 693, 705-06 (1983) (recognizing that, because such waivers are premised on the duty of fair representation, a union may waive a member's statutory and economic rights, as long as the union does not surrender rights that impair the employees' choice of their bargaining representative). Consequently, the mere fact that retirement benefits fall within the scope of section 5 of article XIII does not mean that they are categorically insulated from modification in accordance with the terms of a CBA that has been approved by the union.

¶ 69    Williams also asserts that the retiree health care benefits at issue are beyond the scope of the collective bargaining process because they constitute individual statutory rights. According to Williams, the right to retiree health care benefits cannot be restricted by the union because they are "different in kind" from other terms and conditions in the CBA. In Williams's view, those benefits could not be modified or amended without the individual consent of each retirement system participant. We reject this assertion because it is inconsistent with the overall purpose of collective bargaining.

¶ 70    Section 2 of the Act states that "[i]t is the public policy of the State of Illinois to grant public employees full freedom of association, self-organization, and designation of representatives of their own choosing for the purpose of negotiating wages, hours and other conditions of employment or other mutual aid or protection." 5 ILCS 315/2 (West 2014). Thus, one of the primary goals of collective bargaining is to enable employees to consolidate their economic strength by banding together in a union to improve conditions of their employment. *Stahulak*, 184 Ill. 2d at 184.

¶ 71    As this court has recognized, " '[a] union is allowed a great deal of flexibility in serving its bargaining unit during contract negotiations. It makes concessions and accepts advantages it

believes are in the best interest of the employees it represents. [Citations.] This flexibility includes the right of the union to waive some employee rights, even the employee's individual statutory rights.' " *Ehlers*, 183 Ill. 2d at 93 (quoting *Prudential Insurance Co. of America v. National Labor Relations Board*, 661 F.2d 398, 400 (5th Cir. 1981)); see also *Espinoza v. Cargill Meat Solutions Corp.*, 622 F.3d 432, 442 (5th Cir. 2010). Yet, a labor union's authority to waive individual statutory rights is balanced by the fact that the law imposes on the union a duty of fair representation. 5 ILCS 315/7, 10(a) (West 2014).

¶ 72        The ultimate purpose of a CBA is to express the common understanding of the terms and conditions of employment. See *Kulins v. Malco, a Microdot Co.*, 121 Ill. App. 3d 520, 525 (1984) (citing *Owens v. Press Publishing Co.*, 120 A.2d 442 (N.J. 1956)). As such, it is the embodiment of a reciprocal negotiation between the employer and the labor union, with various strengths on each side. The contracting parties pursue negotiations as a means of achieving a successful result in their common endeavor to adapt their collective bargaining relationship to the demands of their circumstances. Therefore, it is essential that the collective bargaining procedure function as a means of allowing the negotiating parties to engage in the give-and-take process that ensures disputed issues will be resolved through peaceful and orderly procedures that protect the rights of public employees and employers. See 5 ILCS 315/2 (West 2014). Moreover, it has been recognized that, when a collective bargaining agent negotiates on behalf of a collective bargaining unit, some members may be unhappy with the result. See *Vaca v. Sipes*, 386 U.S. 171, 182 (1967). Yet, that circumstance does not alter the fact that the union has the authority, and is obligated, to negotiate for the entire bargaining unit. *Id.* The fact that some persons in the bargaining unit might be dissatisfied does not mean that the terms of the contract are invalid. *Antinore v. State*, 371 N.Y.S.2d 213, 217 (N.Y. App. Div. 1975).

¶ 73        A labor union's ability to negotiate freely to advance the interests of the bargaining unit is essential to the collective bargaining process. To say that a labor union cannot agree that certain benefits are subject to modification would be to say that unions cannot perform the very functions for which they were originally created. Forcing a public employer and a labor union to obtain the individual consent of each unit member would unduly burden the process of negotiation and arbitration, thereby undermining the purpose of collective bargaining and the goals of the Act. Accordingly, we reject Williams's contention that, because the right to retiree health care benefits constitutes an individual right of the employee, a labor union cannot agree to modify that right.[10]

¶ 74        In addition, Williams's reliance on federal cases holding that a labor union is precluded from forfeiting employees' individual statutory and constitutional rights is misplaced. Williams has cited to cases involving a labor union's attempt to waive the right to seek relief for violation of the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621 *et seq.*) (ADEA) and Title VII. See *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 273 (2009); *Equal Employment Opportunity Comm'n v. Indiana Bell Telephone Co.*, 256 F.3d 516, 522 (7th Cir.

---

[10]Moreover, it must be remembered that union members who disagree with the negotiating choices made by their collective bargaining representatives are not without recourse. Those members who object to the actions taken by union negotiators on their behalf can either vote to designate a different bargaining representative or pursue a claim for breach of the duty of fair representation. See 5 ILCS 315/10(b)(1) (West 2014). As noted above, no such claim has been made here.

2001). However, the substance of the holdings in these cases is premised on the determination that a prospective waiver of employment discrimination claims, even by the individual employee, is invalid as against public policy. See *14 Penn Plaza LLC*, 556 U.S. at 259, 265 (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974) (holding that " '[t]here can be no prospective waiver of an employee's rights under Title VII' " (emphasis omitted))); see also *Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728, 740-41 (1981) (holding that the right to seek relief for a violation of the Fair Labor Standards Act cannot be waived because it would negate the purposes of the statute).

¶ 75    This rule applies in circumstances where the statutory right to fair treatment in employment is "separate and distinct from the rights created through the 'majoritarian processes' of collective bargaining." *Barrentine*, 450 U.S. at 737-38 (quoting *Gardner-Denver Co.*, 415 U.S. at 51). Here, the right to retiree health care is not separate and distinct from the rights created by collective bargaining. To the contrary, that right exists only because it was negotiated through the process of collective bargaining. The right to receive health care benefits in retirement is entirely unrelated to the right to be free from discrimination and unfair treatment in employment. Moreover, nothing in Illinois's public policy precludes a union from agreeing to the subsequent modification of certain retirement benefits while negotiating the terms of a CBA. As a consequence, the aforementioned cases have no application here. Based on the analysis set forth above, we conclude that there is no legal impediment that would prevent a labor union from agreeing that certain retirement benefits are not vested and, therefore, may be modified during the collective bargaining process.

¶ 76    We next consider the terms of the 2004 CBA to ascertain the intent of the CTA and the Transit Unions with regard to the vesting of retiree health care benefits provided to Williams and the other Class I plaintiffs who retired under that agreement. Whether the parties to a CBA intended to vest postretirement medical benefits is essentially a question of contract. 51A C.J.S. *Labor Relations* § 385 (2010). As is true with other contracts, the terms of a CBA are interpreted according to traditional rules of contractual interpretation. *Martin v. City of O'Fallon*, 283 Ill. App. 3d 830, 834 (1996); *Board of Education of Du Page High School District No. 88 v. Illinois Educational Labor Relations Board*, 246 Ill. App. 3d 967, 975 (1992); *Board of Governors of State Colleges & Universities v. Illinois Educational Labor Relations Board*, 170 Ill. App. 3d 463, 470 (1988); see also 20 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 55:14, at 57; § 55:27, at 114 (4th ed. 2001); 51A C.J.S. *Labor Relations* §§ 363, 385 (2010).

¶ 77    In construing a contract, the primary goal is to ascertain and give effect to the intention of the parties at the time the contract was formed. *In re Doyle*, 144 Ill. 2d 451, 468 (1991); *Lenzi v. Morkin*, 103 Ill. 2d 290, 293 (1984); *Cedar Park Cemetery Ass'n v. Village of Calumet Park*, 398 Ill. 324, 335 (1947). Where no ambiguity exists, the intent of the parties at the time the contract was entered into must be ascertained from the language of the contract itself. *In re Doyle*, 144 Ill. 2d at 468; *Lenzi*, 103 Ill. 2d at 293; 20 Williston & Lord, *supra*, § 55:20, at 87; § 55:27, at 114. A contract must be construed as a whole, viewing particular terms or provisions in the context of the entire agreement. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011); *Gallagher v. Lenart*, 226 Ill. 2d 208, 233 (2007); 20 Williston & Lord, *supra*, § 55:20, at 87; § 55:27, at 114. Therefore, the parties' intent will not be ascertained by viewing a clause or provision in isolation. *Thompson*, 241 Ill. 2d at 441; *Gallagher*, 226 Ill. 2d at 233.

¶ 78    It is generally recognized that contractual obligations imposed by a CBA cease upon the termination of that agreement. *Litton Financial Printing Division, A Division of Litton Business Systems, Inc. v. National Labor Relations Board*, 501 U.S. 190, 207 (1991) (*Litton*) (recognizing this principle in deciding the applicability of an arbitration clause in a CBA); *Jenkins v. South Bend Community School Corp.*, 982 N.E.2d 343, 347 (Ind. Ct. App. 2013) (same); *Poole*, 831 A.2d at 220, 223 (acknowledging this principle in deciding whether retiree health care benefits were vested under a CBA); see also 20 Williston & Lord, *supra*, § 55:27, at 114. Any exceptions to this rule are to be decided based on contract interpretation. *Litton*, 501 U.S. at 207; *Poole*, 831 A.2d at 220; 20 Williston & Lord, *supra*, § 55:27, at 114.

¶ 79    Whether particular benefits survive the termination of a CBA depends on the intent of the parties. 20 Williston & Lord, *supra*, § 55:27, at 114. Contractual rights that have accrued or vested under a CBA will survive the termination of the contract. *Litton*, 501 U.S. at 207; *Poole*, 831 A.2d at 220; 20 Williston & Lord, *supra*, § 55:27, at 116; 51A C.J.S. *Labor Relations* § 384 (2010).

¶ 80    Before examining the specific provisions of the CBA at issue here, it is appropriate to observe that the term "vested" embraces several different connotations, depending on the context in which it is being considered. It can refer to contract rights that are not subject to unilateral modification or elimination during the term of the agreement. See *Doyle v. Holy Cross Hospital*, 186 Ill. 2d 104, 112 (1999); *York v. Central Illinois Mutual Relief Ass'n*, 340 Ill. 595, 602 (1930). Because one party to a contract cannot by its own acts release or alter its obligation (*York*, 340 Ill. at 602), this concept generally applies to all contractual rights, unless exceptions are set forth in the agreement. This aspect of vesting focuses on the mutuality of the parties' obligations and requires that the parties to the agreement consent to, and provide consideration for, any change in terms while the contract is in effect. *Holy Cross Hospital*, 186 Ill. 2d at 112.

¶ 81    The term "vested" also can refer to a right that expressly survives the expiration of the contract that grants it. See *Litton*, 501 U.S. at 206. This concept of vesting applies where the parties to the agreement have manifested their intent that some rights will continue to be enforceable after the contract term has expired. *Id.* at 207. This concept of vesting is applicable where the agreement includes explicit language providing that certain rights or benefits extend beyond the termination date of that agreement. *Id.* at 207-08.

¶ 82    A third connotation of "vested" refers to a right that is consummated or unconditional, such as where all of the requisite specifications for present or future enjoyment of the right have been achieved. See Black's Law Dictionary 1699 (9th ed. 2009). In the employment context, this connotation is of particular significance when the right at issue has been "accrued" or "earned" by an employee through continued service or satisfaction of some other eligibility requirement. *Litton*, *supra* at 206; *R.J. Corman Derailment Services, LLC v. International Union of Operating Engineers, Local Union 150*, 422 F.3d 522, 526 (7th Cir. 2005). Such rights are said to be "vested" when the employee has fulfilled all of the necessary qualifications and obligations for enjoyment of the right. See *Lawrence v. Board of Education of School District 189*, 152 Ill. App. 3d 187, 197-98 (1987) (quoting *Kulins*, 121 Ill. App. 3d at 525-27). This notion of vesting focuses on the prior employment activities of the employee. *Id.* at 199. As such, it does not necessarily preclude subsequent changes to the contract provision that granted the benefit, but only prevents the denial of a contractual benefit once it has accrued.

See *Kulins*, 121 Ill. App. 3d at 527 (recognizing that, after the contract term providing for severance pay had been modified, employees were not entitled to accrue that benefit in the future); see also *Lawrence*, 152 Ill. App. 3d at 198 (quoting *Kulins*, 121 Ill. App. 3d at 527). A right that has accrued under a contract remains enforceable after the termination of the contract. *Litton*, 501 U.S. at 207. The relevant question here is whether Williams's right to the retiree health care benefits provided in the 2004 CBA is enforceable even though that agreement has expired. As explained above, we look to the language of the contract to ascertain the parties' intent with regard to the vesting of retiree health care benefits.

¶ 83        Section 20.12(a) of the Retirement Plan Agreement provides as follows:

>        "(a) Effective December 1, 1989, a sum will be paid in an amount sufficient to provide insurance coverage for all retirees under the Group Hospital Surgical Major Medical Plan or the Health Maintenance Organization premium, but said sum shall not exceed the premium cost to the [Retirement] Plan effective for such coverage for a retiree on December 31, 2003. This benefit terminates when the retiree attains age 65."

Williams argues that the final sentence in this section is a durational provision, which indicates that the right to receive the health care benefits extends beyond the term of the 2004 CBA. We agree.

¶ 84        The statement that the "benefit terminates when the retiree attains age 65" reflects that the right to the health care benefit in subsection 20.12(a) is extinguished only when the age of the retiree exceeds the specified termination date. The language of this provision demonstrates that the enforceability of the right to health care benefits after retirement is contingent only upon the age of the retiree and is not limited by the durational term of the CBA. This conclusion is further supported by the fact that section 20.12 states that "[u]pon the attainment of age 65 by a retiree who participates in the complement to Medicare Plan, the Plan shall pay a sum sufficient to provide coverage under the Complement to Medicare Plan; provided, however, that such sum shall not exceed the cost to the Plan effective for such coverage on December 31, 2003." When considered together, the language of these two provisions reflects the intent to provide health care benefits to former employees during their retirement and to specify the type of benefit that will be provided based on the age of each retiree.

¶ 85        The Plan and Trust defendants argue that because the final sentence of section 20.12(a) expresses an eligibility requirement, it does not reflect the parties' intent with regard to vesting. This argument fails to take into account the principle that a contract right becomes vested when the employee has fulfilled all of the necessary qualifications and obligations for enjoyment of the right. *Lawrence*, 152 Ill. App. 3d at 197-98 (quoting *Kulins*, 121 Ill. App. 3d at 525-27); see also *Navlet v. Port of Seattle*, 194 P.3d 221, 237 (Wash. 2008) (*en banc*). Even accepting the Plan and Trust defendants' premise, the termination date constitutes a qualification for a benefit to be provided during the former employee's retirement, which the parties certainly recognized could extend beyond the expiration of the 2004 CBA, depending on the age of the individual retiree. Where a retiree is under age 65 and has fulfilled the other prerequisites necessary to establish eligibility, the right to the retiree health care benefit is fully accrued. *Navlet*, 194 P.3d at 235 (recognizing that a vested right "fully accrues" once the recipient becomes eligible to receive the benefit). Where all of the requisite specifications for the present or future enjoyment of a right have been achieved, the right is considered to be vested. Black's Law Dictionary 1699 (9th ed. 2009).

¶ 86    The Plan and Trust defendants further argue that other provisions in the 2004 CBA indicate that retiree health care benefits do not survive the expiration of that agreement. In particular, article 18 of the 2004 WWCA provides that it incorporates the Retirement Plan Agreement "in all respects and for all purposes, including future proposals for revision in the Plan and in the negotiation or arbitration of proposed revisions." Section 23.1 of the Retirement Plan Agreement complements that provision and states that "[t]his Agreement can be changed only in accordance with the provisions of the Wage[s] and Working Conditions Agreement."

¶ 87    Article 19.2 of the 2004 WWCA states that "[e]ither of the parties hereto shall have the right to open this Agreement for modifications and or additions to be effective January 1, 2007, or any anniversary date thereafter by written notice to the other party sixty (60) days prior to such anniversary date." This section further provides that "[a]ll conditions of this Agreement are to continue in full force and effect until changed, revised or amended from time to time by agreement of the parties or by the decision of the Board of Arbitration." The Plan and Trust defendants point out that article 19.2 of the 2004 CBA clearly contemplates that the terms of the 2004 CBA may be modified by agreement or through arbitration after that agreement has expired. According to the Plan and Trust defendants, this provision indicates that retiree health care benefits do not vest. Yet, this generally worded provision cannot be interpreted to affect rights that have become fully accrued prior to the contract's expiration. See *Navlet*, 194 P.3d at 237 (holding that a reservation of rights clause cannot abridge a vested right, which becomes irrevocable when the employee satisfies the eligibility conditions).

¶ 88    Thus, although retiree health care benefits could be changed by agreement upon expiration of the 2004 CBA, Williams retired before that contract expired. In doing so, he satisfied the benefit qualification set forth in section 20.12 and established his eligibility to enforce the right it conferred. There is no indication in the record that he agreed to the modification of his health care benefits, and he was not a member of the bargaining unit during the 2007 arbitration. Consequently, Williams's contractual right to retiree health care benefits under the 2004 CBA was fully accrued and was not modified by agreement or the 2007 arbitration.

¶ 89    For the foregoing reasons, we conclude that the provision of health care benefits to Williams and the other Class I plaintiffs who retired under the 2004 CBA constituted an enforceable, vested right that survived the expiration of that agreement. Accordingly, the circuit court erred in dismissing Williams's claim for breach of contract and his claim for violation of the pension protection clause in article XIII, section 5, of the Illinois Constitution. Ill. Const. 1970, art. XIII, § 5.

¶ 90                              Promissory Estoppel Against the CTA

¶ 91    Lastly, we consider whether Williams can pursue a claim for promissory estoppel against the CTA. Promissory estoppel is a common-law doctrine adopted to permit the enforcement of promises that are unsupported by consideration, such as gratuitous promises, charitable subscriptions, and certain intrafamily promises. See *Holy Cross Hospital*, 186 Ill. 2d at 119-20 (Freeman, C.J., concurring in part and dissenting in part, joined by McMorrow, J.) (citing John D. Calamari & Joseph M. Perillo, The Law of Contracts §§ 6-1 through 6-3 (3d ed. 1987)); 4 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 8:4, at 76, 79 (4th ed. 2008). Promissory estoppel is employed to form a contract when the promisee has detrimentally relied on the promissor's gratuitous promise to do or refrain from doing

something in the future. See 4 Williston & Lord, *supra*, § 8:4, at 47; Restatement (Second) of Contracts § 90, at 242 (1981).

¶ 92    Application of promissory estoppel is proper only in the absence of an express agreement. *Prentice v. UDC Advisory Services, Inc.*, 271 Ill. App. 3d 505, 512-13 (1995) (citing *Wagner Excello Foods, Inc. v. Fearn International, Inc.*, 235 Ill. App. 3d 224, 237 (1992)); see also *Holy Cross Hospital*, 186 Ill. 2d at 120-21 (Freeman, C.J., concurring in part and dissenting in part, joined by McMorrow, J.). This rule applies because promissory estoppel is intended as a means to enforce gratuitous promises and is not designed to provide a party to a negotiated bargain a "second bite at the apple" if it fails to prove breach of contract. (Internal quotation marks omitted.) *Prentice*, 271 Ill. App. 3d at 512 (quoting *Wagner Excello Foods, Inc.*, 235 Ill. App. 3d at 237).

¶ 93    The doctrine operates to impute contractual stature based upon a promise that is not supported by consideration and to provide a remedy to the party who detrimentally relies on that promise. See *Holy Cross Hospital*, 186 Ill. 2d at 120 (Freeman, C.J., concurring in part and dissenting in part, joined by McMorrow, J.) (citing 2A Arthur L. Corbin, Corbin on Contracts § 196A, at 55-56 (Supp. 1991)). Under Illinois law, a promissory estoppel claim will succeed where the other elements of a contract exist (offer, acceptance, and mutual assent), but consideration is lacking. See *Bank of Marion v. Robert "Chick" Fritz, Inc.*, 57 Ill. 2d 120, 124 (1974); see also *Dumas v. Infinity Broadcasting Corp.*, 416 F.3d 671, 677 (7th Cir. 2005) (citing *Bank of Marion*, 57 Ill. 2d at 124). Thus, the doctrine is recognized as creating a contract implied in fact, which imposes a contractual duty based on a promissory expression by the promissor that shows an intention to be bound. 12 Ill. L. and Prac. *Contracts* § 10 (2008); see also *Arthur Rubloff & Co. v. Drovers National Bank of Chicago*, 80 Ill. App. 3d 867, 873 (1980) (citing Arthur L. Corbin, Corbin on Contracts §§ 17, 18, at 38-43 (1963)). A contract implied in fact is a "true contract," under which the parties set the terms and establish the bounds of their liability. 12 Ill. L. and Prac. *Contracts* § 10 (2008) (distinguishing contracts implied in fact from contracts implied in law, which are also referred to as quasi-contracts or constructive contracts).

¶ 94    Although promissory estoppel is distinct from equitable estoppel and applies in different circumstances,[11] similar considerations apply when these doctrines are asserted against public bodies. See *Chicago Limousine Service, Inc. v. City of Chicago*, 335 Ill. App. 3d 489, 499 (2002); see also *Biddle v. BAA Indianapolis, LLC*, 860 N.E.2d 570, 581 (Ind. 2007); *Hortman v. City of Miamisburg*, 852 N.E.2d 716, 720-21 (Ohio 2006). Illinois courts have consistently held that the doctrine of equitable estoppel will not be applied to governmental entities absent extraordinary and compelling circumstances. See *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 35; *Hickey v. Illinois Central R.R. Co.*, 35 Ill. 2d 427, 447-49 (1966); *Lindahl v. City of Des Plaines*, 210 Ill. App. 3d 281, 295-96 (1991). Yet, even assuming that the doctrine of promissory estoppel is applicable in this case, the claim asserted by Williams against the CTA necessarily fails.

---

[11]Promissory estoppel is distinguished from equitable estoppel in that the former allows a party to pursue a claim for damages based on breach of a gratuitous promise of future conduct, and the latter is used as a defense to preclude a party from denying a representation of past or existing fact. See *Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 55-56 (2009); 28 Am. Jur. 2d *Estoppel and Waiver* § 34 (2011); 4 Williston & Lord, *supra*, § 8:3, at 29-33, 42-43; § 8:4, at 44, 47, 57-63.

¶ 95    To establish a claim based on promissory estoppel, the plaintiff must allege and prove that (1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendant, and (4) plaintiff relied on the promise to its detriment. *Newton Tractor Sales, Inc.*, 233 Ill. 2d at 51; *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 309-10 (1990).

¶ 96    Williams's allegations of promissory estoppel against the CTA are set forth in count III of the complaint.[12] In that count, Williams, as representative of the Class I plaintiffs, alleged that the CTA "made numerous unambiguous promises to Class I Members," including (1) that the class members would receive fully paid retiree health care benefits, (2) those benefits would be identical to those enjoyed by current CTA employees, (3) that the class members' retiree health care benefits would be changed only by a method prescribed in a CBA, and (4) that the class members' retiree health care benefits would not be changed without consideration received by the class members in exchange. Williams further alleged that the putative class members relied on these promises by accepting employment at the CTA, working at the CTA, and retiring from the CTA. Williams also asserted that the class members' reliance on these promises was expected and foreseeable by the CTA and was to the class members' detriment.

¶ 97    In support of his promissory estoppel claim, Williams does not point to any specific statement—either written or verbal—in which the CTA promised to continue to provide health care benefits to retirees. Rather, the factual support for Williams's claim is premised on the assertion that "the CTA began providing fully-paid retiree health care benefits in 1980, and continued to provide those benefits until 2009." Williams also alleged that "[f]rom 1980 to July 2009, the CTA acted consistent with the well-established understanding that it had an obligation under the collective bargaining agreements to pay for and provide retiree health care benefits." These allegations are insufficient, as a matter of law, to support a claim for promissory estoppel against the CTA.

¶ 98    The CTA is a municipal corporation that acts through ordinances and resolutions passed by its governing and administrative body, the Chicago Transit Board. 70 ILCS 3605/3, 19, 23 (West 2002); *Schivarelli v. Chicago Transit Authority*, 355 Ill. App. 3d 93, 100 (2005). A municipal corporation cannot be held liable under a contract implied in fact where there has been a failure to comply with a statute or ordinance prescribing the method by which an officer or agent can bind such corporation by contract. *South Suburban Safeway Lines, Inc. v. Regional Transportation Authority*, 166 Ill. App. 3d 361, 366 (1988) (citing *Roemheld v. City of Chicago*, 231 Ill. 467 (1907)). Stated differently, a municipal corporation cannot be obligated under a contract implied in fact that is *ultra vires*, contrary to statutes, or contrary to public policy. *Schivarelli*, 355 Ill. App. 3d at 101 (citing *Lindahl*, 210 Ill. App. 3d at 290, quoting *South Suburban Safeway Lines, Inc.*, 166 Ill. App. 3d at 366). Consequently, a CTA employee cannot act in such a manner as to form a contract without the approval of the Chicago Transit Board. *Schivarelli*, 355 Ill. App. 3d at 101; see also *Chicago Patrolmen's Ass'n v. City of Chicago*, 56 Ill. 2d 503, 507 (1974) (rejecting the plaintiffs' assertion of a quasi-contractual obligation and holding that reliance on the statements of an unauthorized official was unwarranted, where that official lacked the power to bind the municipality and

---

[12]Count III was brought against the CTA and the Retirement Plan. However, the appellate court below affirmed the dismissal of the promissory estoppel claim against the Retirement Plan, and Williams does not challenge that ruling here.

- 23 -

where the party seeking to enforce the promise was charged with notice of the statutory limitation on the official's power).

¶ 99    Here, the CTA can only be contractually bound by official action taken by the Chicago Transit Board. Count III of the complaint does not include any allegations indicating that the Chicago Transit Board made unambiguous promises to continue providing retiree health care benefits in accordance with the terms of the 2004 CBA after it expired.

¶ 100    Moreover, the Pension Code and the Metropolitan Transit Authority Act authorize the CTA to collectively bargain over the terms, conditions, and provisions of any pension or retirement system. 40 ILCS 5/22-101 (West 2002); 70 ILCS 3605/28a(a), (b)(2) (West 2002). The Pension Code also provides that the terms of such a retirement system may be amended or modified by agreement with the labor organization that is the designated representative of the employees for purposes of collective bargaining. 40 ILCS 5/22-101 (West 2002). There is no dispute that the CTA did engage in collective bargaining over retiree health care benefits, and the 2004 and 2007 CBAs resulted from that bargaining process.

¶ 101    In essence, Williams's promissory estoppel claim seeks to enforce a contractual obligation (implied in fact) that goes beyond the terms of the 2004 CBA. Because the CTA engaged in collective bargaining over retiree health care benefits, it is precluded under Illinois law from making "outside" promises of benefits that exceed those set forth in the relevant CBAs. See *Board of Education of Sesser-Valier Community Unit School District No. 196 v. Illinois Educational Labor Relations Board*, 250 Ill. App. 3d 878, 883-84 (1993). Therefore, any "promises" allegedly made to Williams and the Class I plaintiffs before the 2004 CBA expired would have constituted direct dealing in violation of the Illinois Public Labor Relations Act (5 ILCS 315/6, 7, 10(a)(4) (West 2002)). As to "promises" allegedly made after the 2004 CBA expired, the complaint does not allege any specific, unambiguous promises by the Chicago Transit Board, and this deficiency cannot be cured by amendment in light of the fact that the CTA accepted the terms of the Benn award and signed the Memorandum of Understanding. Because Williams has not, and cannot, adequately allege a claim for promissory estoppel against the CTA, count III was properly dismissed with prejudice.

¶ 102                                   CONCLUSION

¶ 103    In sum, we hold that Matthews, Sams, Boyne, and Brown lack standing to challenge the enforceability of the 2007 CBA, but Williams has standing to challenge its enforceability with regard to himself and the other Class I plaintiffs who retired before its effective date. We further hold that Williams failed to allege a claim for promissory estoppel against the CTA. Accordingly, dismissal of that claim was proper. However, Williams sufficiently stated a cause of action for breach of contract and for violation of the pension protection clause set forth in article XIII, section 5, of the Illinois Constitution against the Plan and Trust defendants. As a consequence, the circuit court erred in dismissing those claims.

¶ 104    For the foregoing reasons, we affirm that portion of the appellate court's judgment which upheld the dismissal of all claims by the Class II plaintiffs. We also affirm that portion of the judgment holding that the Class I plaintiffs stated a cause of action for breach of contract against the Plan and Trust defendants. We further affirm that portion of the judgment which held that the Class I plaintiffs stated a cause of action for declaratory judgment against the Plan and Trust defendants. We also affirm that portion of the judgment which reversed the dismissal

of the Class I plaintiffs' claim for violation of article XIII, section 5, of the Illinois Constitution against the Plan and Trust defendants. Finally, we reverse that portion of the appellate court's judgment holding that the Class I plaintiffs stated a claim for promissory estoppel against the CTA. Accordingly, we remand the cause to the appellate court with directions to remand to the circuit court for further proceedings.

¶ 105    Appellate court judgment affirmed in part and reversed in part.

¶ 106    Cause remanded.

¶ 107    JUSTICE THEIS, specially concurring:

¶ 108    Today, Illinois faces unprecedented fiscal challenges, the most important of which may be to ensure a future for chronically underfunded state and municipal pension systems. Officials have attempted solutions to this growing problem, but those solutions have been attacked in court. What should be matters for the political branches have become matters for the judiciary that, with increasing frequency, end with us. In 2014, we held that subsidized health care provided to state employees was a benefit of membership in a state retirement system protected by article XIII, section 5, of the Illinois Constitution of 1970. *Kanerva v. Weems*, 2014 IL 115811, ¶ 40. In 2015, we held that pension benefits provided to state employees are covered by the so-called pension protection clause when those employees first begin employment, and those benefits cannot be later unilaterally diminished or eliminated by legislative fiat. *In re Pension Reform Litigation*, 2015 IL 118585, ¶ 46 n.12 (*Heaton*). In March, we intimated that pension benefits may be modified through collective bargaining. *Jones v. Municipal Employees' Annuity & Benefit Fund*, 2016 IL 119618, ¶ 55. In my view, those cases decide this case, but the majority barely mentions them.

¶ 109    The majority's indifferent approach to our latest pronouncements in this area stems from its struggle to identify the issue before the court. Initially, the majority states that the issue is "the enforceability of plaintiffs' rights to retiree health care benefits as set forth in the 2004 collective bargaining agreement." *Supra* ¶ 1. Later, the majority indicates that it must address "enforceability of retiree health care benefits provided to public employees in a CBA or whether such benefits may be subject to modification through the collective bargaining process." *Supra* ¶ 54. Both characterizations are correct, but enforceability of retirees' rights to health care benefits is not the issue that drives the majority's analysis. Instead, the majority addresses the parties' arguments regarding vested rights. According to the majority, the court must "first consider whether the pension protection clause operates to automatically vest the retirement benefits of public employees, regardless of the terms of the contract that confers those rights" (*supra* ¶ 57), then "next consider the terms of the 2004 CBA to ascertain the intent of the CTA and the Transit Unions with regard to the vesting of retiree health care benefits" (*supra* ¶ 76).

¶ 110    The majority's willingness to take the parties' lead and adopt their "vested rights" terminology is understandable because they discuss little else in their briefs. In fact, from the beginning, the parties have framed their arguments with respect to vested rights, and the lower courts have addressed those arguments in those terms. Everything below—from the filing of the complaint to the filing of the appellate court opinion—happened before we made a

definitive statement about the relationship between health care benefits and pension benefits in *Kanerva*, so the parties and the lower courts latched onto a body of law that covers both.

¶ 111　　　　Unfortunately, that body of law involved the federal Employee Retirement Income Security Act of 1974 (ERISA). See 29 U.S.C. § 1001 *et seq.* (2012). Under ERISA, "vested" is a shorthand descriptor for benefits that an employer cannot unilaterally terminate or modify. Generally, pension benefits are vested and outlast the term of a CBA; "welfare benefits," including health care benefits, are not vested and do not outlast the term of a CBA. See *International Union, United Automobile, Aerospace & Agricultural Implement Workers v. Skinner Engine Co.*, 188 F.3d 130, 137-38 (3d Cir. 1999) ("Although ERISA contains elaborate vesting requirements for pension plans, it does not require automatic vesting of welfare benefit plans."). ERISA gives employers an absolute right to modify or terminate health care benefits at any time, though employers may waive that right and provide by contract that such benefits are vested.

¶ 112　　　　Over time, a split developed in the federal courts of appeal on the issue of how to construe contract language to determine whether employers have done that. In this case, the lower courts both engaged that precedent. The trial court sided with the Seventh Circuit, which has applied a strict presumption against vesting (see, *e.g.*, *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539 (7th Cir. 2000)), and the appellate court sided with the Sixth Circuit, which has applied an inference for vesting (see *International Union, United Automobile, Aerospace, & Agricultural Implement Workers v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983). In *M&G Polymers USA, LLC v. Tackett*, 574 U.S. ___, 135 S. Ct. 926 (2015), the Supreme Court rejected the latter approach and instructed federal courts to use ordinary principles of contract law in determining whether welfare benefits were vested under the terms of a particular agreement. The majority states that *Tackett* overruled the reasoning employed by the appellate court here and proceeds without applying such an inference. *Supra* ¶ 52.

¶ 113　　　　*Tackett* and its progeny (see, *e.g.*, *Gallo v. Moen Inc.*, 813 F.3d 265 (6th Cir. 2016)) would control our analysis if this dispute arose under the Labor Management Relations Act, 1947 (29 U.S.C. § 141 *et seq.* (2012)), and ERISA. It did not. Therefore, those cases are inapposite. Contrary to the argument of the Retirement Plan and Health Care Trust defendants, nothing about *Tackett*'s holding is "critical" to resolving the issue in this case because federal law does not govern the interpretation of CBAs with state and local governments. See 29 U.S.C. § 152(2) (2012); *Davenport v. Washington Education Ass'n*, 551 U.S. 177, 181 (2007) ("The National Labor Relations Act leaves States free to regulate their labor relationships with their public employees."). ERISA generally preempts state law relating to private-sector employee benefit plans (see 29 U.S.C. § 1144(a) (2012)), but that Act does not apply to "governmental" or public-sector employee plans (29 U.S.C. § 1003(b)(1) (2012)). Here, the plaintiffs' employer was a municipal entity, and the interpretation of the 2004 CBA rests, not on federal law, but on Illinois law.

¶ 114　　　　In this area, Illinois law departs drastically from federal law. Health care benefits are treated differently than pension benefits under federal law. Under Illinois law, as we explained in *Kanerva*, health care benefits are pension benefits. Further, ERISA offers private-sector employers an absolute right to modify or terminate health care benefits, while the pension protection clause denies public-sector employers such a right. See *Heaton*, 2015 IL 118585,

¶ 46 n.12. In Illinois, it is the employee's rights, not the employer's rights, that are protected. The majority summarizes our recent holdings in *Kanerva* and *Heaton*:

> "[T]he plain meaning of [the pension protection] clause demonstrates that it protects all of the benefits that flow from the contractual relationship arising from membership in a public retirement system. [Citation.] *** [B]ecause retiree health care benefits provided by statute to state employees are benefits of membership in a public retirement system, they are constitutionally protected from unilateral diminishment or impairment through legislative action. [Citations.]" *Supra* ¶ 54.

¶ 115    Notably, the term "vested" does not appear in that passage. Nor does it appear in *Kanerva*. It appears once in *Heaton*, 2015 IL 118585, ¶ 57, but only where the court discussed the facts in *Jorgensen v. Blagojevich*, 211 Ill. 2d 286 (2004), which addressed the judicial salary clause of the Illinois Constitution (Ill. Const. 1970, art. VI, § 14), not the pension protection clause. "Vested" has been used in other pension protection clause cases from this court (see, *e.g.*, *People ex rel. Sklodowski v. State*, 182 Ill. 2d 220 (1998)), but it is not in the text of the constitutional clause itself. In my view, if "vested" has no place in our pension protection clause (see Ill. Const. 1970, art. XIII, § 5 ("Membership in any pension or retirement system of the State *** shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired.")), its place in our pension protection clause jurisprudence is dubious. That term, as demonstrated by the majority's awkward description of its various, context-dependent connotations (see *supra* ¶¶ 79-82), only serves to distract us from a disciplined constitutional analysis.

¶ 116    The overriding issue in this case is not whether CTA retirees' rights to their health care benefits were vested but, rather, as the majority correctly asserted in its opening sentence, whether those rights were enforceable. That inquiry turns on the contract because "the contractual relationship protected by section 5 of article XIII is governed by the actual terms of the contract or pension plan in effect at the time the employee becomes a member of the retirement system." *Supra* ¶ 59; accord *Heaton*, 2015 IL 118585, ¶ 46 ("The protections afforded to such benefits by article XIII, section 5 attach once an individual first embarks upon employment in a position covered by a public retirement system, not when the employee ultimately retires." (citing *Di Falco v. Board of Trustees of the Firemen's Pension Fund of Wood Dale Fire Protection District No. One*, 122 Ill. 2d 22, 26 (1988))); *Kerner v. State Employees Retirement System*, 72 Ill. 2d 507, 514 (1978). The majority insists that the pension protection clause created no "vesting rules." *Supra* ¶ 63. Our case law instructs that it did create one very simple *de facto* vesting rule: Public employees' rights to benefits are constitutionally protected when they begin their jobs.

¶ 117    I agree with the majority that the mere fact that health care benefits fall within the scope of the pension protection clause does not mean that they are "categorically insulated from modification in accordance with the terms of a CBA that has been approved by the union." *Supra* ¶ 68. As the majority observes, public servants whose employment is governed by a contract are guaranteed under the state constitution only those retirement benefits provided in those contracts: "[I]f the underlying contract allows for the modification of certain retirement benefits, the pension protection clause does not preclude modification or alter the essential nature of the rights granted under the contract." *Supra* ¶ 66. That echoes what we said last year: Under the pension protection clause, benefits cannot be unilaterally diminished or eliminated.

See *Heaton*, 2015 IL 118585, ¶ 46 & n.12. It also echoes what we implied more recently: Benefits can be bilaterally modified through collective bargaining. See *Jones*, 2016 IL 119618, ¶ 55. That is, our constitution certainly does not prevent an agreement to modify pension benefits. The question becomes whether Williams, who represents CTA retirees, made such an agreement. The majority asserts that he did not. I strongly agree.

¶ 118 The 2004 CBA was comprised of two parts: the Wages and Working Conditions Agreement (WWCA) between the two transit union locals and the CTA and the Retirement Plan Agreement (RPA). Section 20.12(a) of the RPA in effect at that time provided:

> "(a) Effective December 1, 1989, a sum will be paid in an amount sufficient to provide insurance coverage for all retirees under the Group Hospital Surgical Major Medical Plan or the Health Maintenance Organization premium, but said sum shall not exceed the premium cost to the [Retirement] Plan effective for such coverage for a retiree on December 31, 2003. This benefit terminates when the retiree attains age 65."

Section 23.1 of the RPA added that the RPA is part of the WWCA between the parties and can be changed only in accordance with the WWCA.

¶ 119 Similarly, article 18 of the WWCA stated, "The Retirement Plan is a part of this Agreement in all respects and for all purposes, including future proposals for revision in the Plan and in the negotiation or arbitration of proposed revisions." Section 19.2 of the WWCA provided:

> "Either of the parties hereto shall have the right to open this Agreement for modifications and[/]or additions to be effective January 1, 2007, or any anniversary date thereafter by written notice to the other party sixty (60) days prior to such anniversary date. Notification submitted in accordance with the foregoing shall contain a written statement of all modifications and[/]or additions to the Agreement which are proposed. If no agreement is reached within said sixty (60) days, or such further time as the parties may agree upon, the matter shall be submitted to arbitration ***. All conditions of this Agreement are to continue in full force and effect until changed, revised or amended from time to time by agreement of the parties or by the decision of the Board of Arbitration."

Section 20.12(a) of the RPA clearly expresses an intent by the parties to ensure that pre-2007 retirees would receive health care benefits until age 65. It does not refer to eligibility, only a termination date (a retiree's sixty-fifth birthday), which, depending on the retiree's age, could fall outside the effective dates of the CBA.

¶ 120 Section 19.2 of the WWCA contemplated and permitted modification of its terms, but only by agreement of the parties. Saying that the 2004 CBA could be modified in 2007 does not mean that Williams agreed to any modification. The 2004 CBA could be modified but not until it expired in 2007. Williams retired before then. Nothing in the language of section 19.2 indicated that he agreed to the reduction in his health care benefits that came three years after he left the CTA.

¶ 121 Fixing Illinois's public pension systems may be a political matter, but the methods for doing so remain legal matters. This court, however, must be cognizant of its limited role and deliberate in its decision making. We must answer the questions before us in line with our precedent. In my view, this case can be decided by simply applying *Kanerva*, *Heaton*, and *Jones*. The majority strays from those cases and takes an ill-advised detour through vested

rights. Though the majority reaches a correct result as to plaintiff Williams, I cannot join in its problematic analysis.

¶ 122     JUSTICE KARMEIER joins in this special concurrence.

¶ 123     JUSTICE KARMEIER, specially concurring:

¶ 124     I join Justice Theis's well-reasoned special concurrence. I write separately to raise two additional problems with the majority's opinion. First, in the course of its analysis of the claims asserted by Williams, who seeks to represent the Class I plaintiffs, the majority engages in a protracted discussion of the authority of unions to agree to terms in collective bargaining agreements that operate as a waiver of their members' constitutionally protected rights or their statutory and economic rights (*supra* ¶¶ 67-75). This discussion constitutes an improper advisory opinion.

¶ 125     As the majority itself points out in explaining why Williams, the pre-2007 retiree, has standing to bring this action, he was no longer a public employee and was therefore outside the collective bargaining unit and not represented in the collective bargaining and interest arbitration proceedings that led to the reduction in benefits challenged in this case. *Supra* ¶¶ 41-49. Because "the Transit Unions did not represent Williams or the other Class I retirees during [this] collective bargaining process" (*supra* ¶ 49), it necessarily follows that the Transit Unions could not, as a matter of law, waive any rights belonging to those individuals. Accordingly, whether and to what extent the Transit Unions could waive the rights of their existing members is irrelevant. No such individuals are before us. The only people who belonged to the union during the relevant period—the Class II plaintiffs—are being dismissed based on lack of standing.

¶ 126     It is axiomatic that Illinois courts " 'do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided' " (*Wright Development Group, LLC v. Walsh*, 238 Ill. 2d 620, 632 (2010) (quoting *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009))), nor will we review cases merely to set precedent or guide future litigation (*In re Marriage of Donald B.*, 2014 IL 115463, ¶ 23). The majority should therefore have omitted the entire discussion of this point.

¶ 127     Second, after concluding that "the provision of health care benefits to Williams and the other Class I plaintiffs who retired under the 2004 CBA constituted an enforceable, vested right that survived the expiration of that agreement" and that "the circuit court erred in dismissing Williams's claim for breach of contract and his claim for violation of the pension protection clause in article XIII, section 5 of the Illinois Constitution," the majority proceeds to consider in detail and then reject Williams's additional claim for promissory estoppel. *Supra* ¶¶ 90-101. Once again, this discussion is unnecessary to the disposition. Under indistinguishable circumstances in *Kanerva v. Weems*, 2014 IL 115811, ¶ 58, we expressly held that "[o]ur holding that plaintiffs are entitled to proceed on their pension protection clause claims obviates the need to address the sufficiency of their remaining claims," which included a claim for promissory estoppel (*id.* ¶ 23). That is equally true here. Why the majority has decided to take a contradictory position in this case is inexplicable. Consistency in the law is not the only thing, but it is an important thing, particularly where the stakes are so high for so many.

¶ 128    In addition to joining Justice Theis's special concurrence, I therefore decline to join those portions of the majority's opinion addressing these two additional matters.