2025 IL App (1st) 240066

First Division
June 30, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| DAVID BARRON and MICHAEL LYNCH, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | No. 2022 CH 08557 |
| v. | ) | |
| | ) | |
| THE CITY OF CHICAGO, a Municipal Corporation, | ) ) | |
| | ) | Honorable |
| Defendant-Appellee. | ) | Claire J. Quish, |
| | ) | Judge, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court, with opinion.
Justices Lavin and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiffs-Appellants David Barron and Michael Lynch, individually and on behalf of all others similarly situated, appeal from the circuit court's December 12, 2023, order granting the defendant-appellee City of Chicago's motion to dismiss plaintiffs' amended complaint purporting to assert a class action for violation of Chicago Fire Department (CFD) promotion procedures. On appeal, plaintiffs argue that the circuit court erred in concluding that it lacked subject matter

jurisdiction, as plaintiffs' claims were preempted by the Illinois Public Labor Relations Act (5 ILCS 315/1 *et seq.* (West 2020)) and, thus, plaintiffs were required to pursue their claims in arbitration. For the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Plaintiffs are a group of firefighters employed by CFD. On August 30, 2022, they filed a class action lawsuit against the City of Chicago (City). On October 6, 2022, the City filed a motion to dismiss plaintiffs' complaint. On February 9, 2023, following a hearing, the circuit court granted, in part, the City's motion to dismiss pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2020)), dismissed counts I and III of plaintiffs' complaint, and allowed plaintiffs leave to file an amended complaint.

¶ 4      On March 9, 2023, plaintiffs filed a first amended complaint, which is the subject of this appeal. Therein, plaintiffs alleged the following. For multiple decades, the City's practice for promoting firefighters to lieutenants involved creating an eligibility list and, as lieutenant openings occurred, promoting all firefighters on that list until all with a passing score of 70 or above had been promoted. This practice was incorporated in the City's 2013 Hiring Plan for firefighters. The eligibility list ranked the firefighters according to their interview scores, test scores, and other criteria. Firefighters on the list would then be offered, in rank order, the opportunity to be promoted to the lieutenant position following the requisite training.

¶ 5      The City created an eligibility list in 2009, which included plaintiffs. The City did not begin promoting firefighters from that list until all eligible candidates from the 1999 list had been promoted. In March 2022, the City confirmed that there were 124 vacancies of officer positions (including 80 lieutenant positions), and those positions would be filled in April, July, and November of that year. In April, 41 of the 80 lieutenant vacancies were filled. Afterwards, instead

of continuing to fill the lieutenant vacancies in July from the 2009 list, the City retired that eligibility list with no stated justification for doing so. Plaintiffs alleged that "the next Firefighter to be promoted [on the 2009 list] was a staunch political opponent of the Chicago Mayor" and the City "retired the eligibility list to prevent the Mayor's opponent from future promotion." As a result, plaintiffs alleged that they were denied promotions they had been waiting for more than 10 years. It was also alleged that plaintiff David Barron submitted a Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2020)) request for documentation of the justification for retiring the list, and the City replied that there were no responsive documents to the request.

¶ 6    After plaintiffs Barron and Michael Lynch filed the initial complaint in this action, the City reinstated the 2009 eligibility list and subsequently promoted the next 41 firefighters on that list to lieutenant positions. The City did not promote the remaining 26 firefighters on the 2009 eligibility list, despite there being open lieutenant positions. In early 2023, the City again retired the 2009 eligibility list and offered lieutenant training to firefighters on a new eligibility list ahead of the remaining eligible firefighters from the 2009 list.

¶ 7    Plaintiffs are comprised of two groups: those who were promoted to the lieutenant position in November 2022 from the 2009 eligibility list (promoted plaintiffs) and those who were on the 2009 eligibility list but had not yet been promoted to the lieutenant position, despite having a passing score (unpromoted plaintiffs).[1] All plaintiffs scored a passing score of 70 or above on the lieutenant examination. Both groups were allegedly damaged by the City's actions through lost pay, lost benefits, lost experience in the lieutenant position, and delay in further advancement in

---

[1]Because some of the plaintiffs had been promoted, in its motion to dismiss, the City argued that plaintiff's claims were moot. Plaintiffs allege that some of the class have still not been promoted and monetary damages could still be owed to those plaintiffs who were promoted. The City has not pursued its mootness argument here on appeal, and we have no occasion to address it.

CFD, which requires three years in the position of lieutenant. Plaintiffs alleged three counts against the City: breach of contract for failing to fill the lieutenant vacancies from the 2009 eligibility list in violation of the Hiring Plan (count I); breach of the implied covenant of good faith and fair dealing for the same (count II); and promissory estoppel (count III). Under each count, plaintiffs request that (1) the City be directed to reinstate the 2009 eligibility list; (2) the unpromoted plaintiffs be immediately allowed to attend lieutenant training and fill openings identified in 2022 and 2023; (3) the City be restrained from filling lieutenant openings other than in accordance with the 2009 eligibility list; and (4) plaintiffs be awarded compensatory damages, lost benefits, and attorney's fees.

¶ 8       Attached to the complaint was CFD's Hiring Plan for Uniformed Positions (Hiring Plan). The Hiring Plan was developed by the City as required under section 1.F. of the settlement order and accord in *Shakman v. Democratic Organization of Cook County*, No. 69 C 2145 (N.D. Ill. Mar. 20, 2007), https://www.chicago.gov/dam/city/depts/dhr/supp_info/ShakmanSettlement/ NoticeofSettlementAccord32007.pdf [https://perma.cc/D5WR-5QWT], in the United States District Court of the Northern District of Illinois. Although not discussed in detail in the record or either party's brief, we briefly set forth pertinent details of the *Shakman* accord. Following a series of lawsuits, consent judgments were issued in 1972 and 1983 in which the City agreed to eliminate political considerations from employment decisions. Further litigation began in the early 2000s, alleging violations of the consent decree. On May 31, 2007, an Agreed Settlement Order and Accord (Accord) was entered. See *id.* Therein, the City was directed to create a "New Plan," which would "be fully incorporated by reference into the Accord." The result was the current 2013 Hiring Plan. The Accord was terminated in 2014 in response to the City's demonstration of substantial compliance. Notably, the Accord stated:

"The Parties to the Accord recognize and agree that the City has collective bargaining relationships with unions representing City employees, that the Illinois Public Labor Relations Act, 5 ILCS 315, et seq. ("Act") governs those relationships, and that this Accord will be construed and administered consistent with the Act, to the extent that the construction or administration does not conflict with the United States Constitution or federal civil rights laws." *Id.*

¶ 9 Turning back to the Hiring Plan, Chapter IV of the Plan, titled "General Hire Process for Uniformed Positions—Non-Interviewed Positions," provides that a list of "Eligible Candidates in rank order of all Applicants who completed all required portions of the examination" shall be created and "[t]he [Department of Human Resources] Commissioner, in consultation with the Fire Commissioner, shall order the establishment of a new Eligibility List." Further, "[a]ll Eligible Candidates shall be considered for vacancies in rank order from the applicable Eligibility List unless otherwise provided for by the [collective bargaining agreement (CBA).]" Regarding the retirement of eligibility lists, the Plan states:

"Eligibility Lists may be retired at the discretion of the Fire Commissioner, in consultation with the DHR Commissioner, provided that no Eligibility List shall be used for longer than eight (8) years after it has been established unless there is a lack of available funds for testing and/or low utilization of the Eligibility List due to the lack of promotional opportunities, in which case the Eligibility List will be retired as soon as practicable after funding has been made available for a new examination. The Fire Commissioner's

justification for the retirement of the Eligibility List shall be documented in the hiring file."[2]

¶ 10    On April 21, 2023, the City filed a combined motion to dismiss plaintiffs' amended complaint, pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2020)). Under section 2-619(a)(1) (*id.* § 2-619(a)(1)), the City argued that all of plaintiffs' claims should be dismissed because the circuit court lacked subject matter jurisdiction and, instead, jurisdiction laid exclusively with the Illinois Labor Relations Board because the claims involved a dispute that requires the interpretation of the CBA between the City and the Chicago Fire Fighters Union, Local 2 of the International Fire Fighters Union (Union). Thus, according to the City, the Public Labor Relations Act preempted plaintiffs' claims. The City also argued that plaintiffs lacked standing, plaintiffs failed to exhaust their administrative remedies, and the City has immunity from liability on quasi-contractual theories. Under section 2-615, the City argued that plaintiffs failed to sufficiently plead their claims for breach of contract, breach of implied covenant of good faith and fair dealing, and promissory estoppel. Attached to the City's motion were a number of exhibits: (1) the CBA, (2) an affidavit from Brian Helmold, (3) a collection of "First Step Grievances," and (4) the City's Personnel Rules.

¶ 11    The CBA states that it is effective from July 1, 2017, through June 30, 2021, but remains in effect while the parties negotiate a new agreement. There is no dispute that this CBA remained

---

[2]We note that the Hiring Plan also contains Chapter IX, titled "Compliance and Governance," providing that it "grants oversight to the City's Office of the Inspector General," which established the Hiring Oversight Section "to redress any and all issues regarding City hiring" and to receive "complaints regarding the hiring process, including allegations of unlawful political discrimination and retaliation and other improper influence in connection with any aspect of City employment." This Hiring Oversight Section "shall, when appropriate, refer complaints and other instances of non-compliance to the Investigations Section" of the Office of the Inspector General. For reasons unknown to this court, neither party addresses this section of the Hiring Plan or its applicability to the issues involved here.

in effect at all times during this litigation. Relevant here, Article VI of the CBA, titled "Entire Agreement," states that "[t]his Agreement constitutes the complete and entire Agreement between the parties and concludes collective bargaining (except as provided for in the grievance procedure) for its term. Amendments and modifications of this Agreement may be made by mutual written agreement of the parties to this Agreement."

¶ 12    Article IX, titled "Seniority Rights," contains section 9.3, which addresses vacancies and promotions and states the following under subsection A:

"Promotional vacancies within the bargaining unit created as a result of death, resignation, retirement and discharge for just cause, and which the Employer must fill to maintain the minimum manning agreed to in this Agreement, shall be filled within forty-five (45) days of the last day the employee actually worked on duty or was discharged. Promotions which are required to fill vacancies shall be made from established lists resulting from job related examinations given to the employees in the classification immediately below the vacancy, and effective upon contract ratification, an employee who was passed over on an eligibility list shall be permitted to take the examination and be placed on the eligibility list for the rank above that for which the employee was passed over (for example, a firefighter or engineer passed over for promotion to lieutenant shall be permitted to take the captains examination and be placed on the eligibility list for captains.) Effective upon contract ratification, the Employer shall provide to employees while on duty, training for and the cost of certifications necessary for promotion."

¶ 13    Subsection B.2. provides:

"Promotional vacancies shall be filled by the Commissioner from eligible employees certified from the applicable promotional eligibility list. After each promotional

examination, the City shall develop an eligibility list based upon employees eligible for promotion based on their performance on the administered examination. No less than thirty (30) days prior to any promotions, the City shall provide to the Union a copy of the promotional eligibility list. Such list shall reflect each employee's full name, seniority number, race, gender, total score and rank on the list. Vacancies will customarily be filled by employees in the order of their ranking on the eligibility list.

Employees who are passed over on an eligibility list strictly by operation of the preceding paragraph and who otherwise would have been promoted had promotions been made in rank order from the eligibility list shall have his or her name inserted at the top of the new eligibility list in rank order as it appeared on the previous eligibility list for the same promoted position, and shall be promoted from the new eligibility list to vacancies which will customarily be filled by employees in the order of their ranking on the eligibility list.

Additionally, that subsection provides that "no employee may be promoted to the position of engineer or lieutenant, and shall be passed over on the eligibility list, without fifty-four (54) months in the classification of firefighter and/or engineer." It continues with a list of reasons why an employee certified for a promotion may be passed over for a vacancy. Subsection B.4. addresses the "performance selection process," which provides that up to 16% of the promotions to the rank of lieutenant may be made by the Fire Commissioner on the basis of performance and then lists the necessary criteria for a performance promotion.

¶ 14    Article X, titled "Grievance Procedure," sets forth the manner in which "[a]ny grievance or dispute which may arise between the parties, including the application, meaning or interpretation of this Agreement" will be settled.

¶ 15    Finally, Article XIV, titled "Management Functions," provides:

> "It is the right of the Employer to unilaterally determine matters of inherent managerial policy and to implement decisions with respect thereto, which include, but are not limited to, the following: the right to determine services to be offered by its agencies; to establish its overall budget; to direct its employees; to determine the content of examinations, the necessary requirements to participate in the examination process, and the minimum qualifications for all positions; to discipline or discharge employees for proper cause; to relieve its employees from duty because of lack of work or for other legitimate reasons; to maintain and improve efficiency of governmental operations; to determine the methods, means and personnel by which government operations or a unit thereof are to be conducted; to determine the content of job classifications; to take all necessary actions to carry out its mission in emergencies; and to exercise control and discretion over its organization and the technology of performing its work.

> This Agreement shall be construed however as requiring the Employer to follow the provisions of this Agreement in the exercise of the foregoing rights."

¶ 16    A July 30, 2020, letter agreement attached to the CBA confirmed the City and Union's agreement that, "in the event the City utilizes performance selection promotions from eligibility lists derived from examinations administered after January 1, 1997, the City will forgo making such promotions on the last promotional order before the eligibility list is retired." The City also agreed that "the last promotional order will include at least 16% of the total promotions previously made from that eligibility list, and that the last promotions will be in strict rank order from the eligibility list."

¶ 17    In an affidavit, Brian Helmold, deputy fire commissioner, administrative services, averred that he was familiar with plaintiffs' allegations and set forth the timeline regarding the retirement, adoption, and readoption of the 2009 and 2019 eligibility lists, as laid out above. He also identified a number of grievance reports filed by plaintiffs and noted that each of them was denied by the City and none were "elevated to arbitration."

¶ 18    Also included as an exhibit was a collection of plaintiffs' grievance reports filed with the City between July 2022 and February 2023. Almost all of them stated that there was a violation of section 9.3 of the CBA. Several of them also claimed violation of the Hiring Plan. Additionally, there was a grievance report filed by the Union with the City on October 29, 2022. That grievance claimed that the City improperly passed over members from the 2019 eligibility list in favor of the canceled 2009 eligibility list when it was "reinstated," citing a violation of section 9.3 of the CBA. The grievance explained: "Based on the language found in the CBA ***, the City has unfairly passed over members on a promotional eligibility list for reasons other than what is specified in the [CBA]."

¶ 19    On June 14, 2023, plaintiffs filed their response to the City's motion to dismiss, arguing, *inter alia*, that their complaint was not brought under the CBA and, instead, the issues arise from the Hiring Plan, which is "a separate agreement between the Plaintiffs and the City." Attached to their response were several exhibits, including an affidavit from Barron. Therein, Barron averred that he filed a grievance with the Union on July 14, 2022, and, on July 28, 2022, he received a letter from CFD denying the grievance. On August 10, 2022, he attended a Union meeting, with approximately 10 other plaintiffs, to discuss the grievance with a panel of his peers, and the panel members informed them that the matter should be pursued in court because it was not related to the CBA. Barron was later advised that the Union would not take the grievance to arbitration, and

he subsequently appeared before the executive board on August 16, 2022, to request arbitration. Once again, Barron and several other plaintiffs were advised that the Union would not take the grievance to arbitration because it did not involve the CBA. On September 1, 2022, another letter from CFD was received, denying the grievance a second time. Finally, he averred that other plaintiffs had filed similar grievances, were similarly denied, and were advised that the grievances did not fall under the CBA. Also attached to the response were several documents from the grievance process. In particular, there were a number of letters from the Union to grievants, stating that their "grievance has not been sustained" because "[t]he complaint or remedy you asked for is not a contractual obligation in the present agreement."

¶ 20    On July 13, 2023, the City filed its reply in support of its motion to dismiss plaintiffs' complaint. On September 7, 2023, the circuit court held a hearing on the City's motion, a transcript of which is not contained in the record. On September 20, 2023, plaintiffs filed a post-hearing supplemental brief. On October 4, 2023, the City filed a response to the supplemental brief.

¶ 21    On December 12, 2023, the circuit court entered an order, granting the City's motion to dismiss plaintiffs' amended complaint with prejudice, "finding that Plaintiffs' claims are preempted by the Public Labor Relations Act and this Court lacks subject matter jurisdiction." The court noted that plaintiffs' claims properly lie with the Illinois Labor Relations Board and cited *Sims v. Dart*, 2022 IL App (1st) 210890-U, as well as *Glasper v. Scrub Inc.*, 2021 IL App (1st) 200764, for support of its conclusion. Plaintiffs did not file a motion for reconsideration.

¶ 22    This timely appeal followed.

¶ 23                                    II. ANALYSIS

¶ 24    On appeal, plaintiffs argue that the circuit court erred in concluding that the Public Labor Relations Act preempted their claims and plaintiffs had to pursue their claims in arbitration.

According to plaintiffs, the CBA does not specifically address the issue in this case, and thus, they are not required to arbitrate their claims. Accordingly, they request that this court reverse the circuit court's dismissal of their amended complaint and remand for further proceedings.

¶ 25 Section 2-619.1 of the Code (735 ILCS 5/2-219.1 (West 2020)) provides for a combined motion under sections 2-615 and 2-619 (*id.* §§ 2-215, 2-619)). A section 2-615 motion to dismiss challenges the legal sufficiency of the plaintiff's pleadings. *Id.* § 2-615. A motion to dismiss pursuant to section 2-619 admits the sufficiency of the complaint, but asserts that an affirmative matter, such as a lack of subject matter jurisdiction, nonetheless defeats the claim. *Id.* § 2-619(a)(1). We review a circuit court's dismissal of a complaint under section 2-619.1 *de novo*. *Hampton v. Chicago Transit Authority*, 2018 IL App (1st) 172074, ¶ 19. Under this standard, we may affirm the circuit court's decision on any basis supported by the record, but we begin with the court's basis for dismissal: lack of subject matter jurisdiction. When reviewing the grant of a section 2-619 motion to dismiss, we accept as true all well-pleaded facts in the complaint and interpret the pleadings and supporting documents in the light most favorable to the plaintiff. *Id.* ¶ 20.

¶ 26 Subject matter jurisdiction refers to "the power of a court to hear and determine cases of the general class to which the proceeding in question belongs." *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 334 (2002). The Illinois Constitution has vested the circuit court with original jurisdiction over all justiciable matters, except in certain circumstances. Ill. Const. 1970, art. VI, § 9. However, the legislature is empowered to vest original jurisdiction in an administrative agency and may do so where it enacts a comprehensive statutory scheme creating rights and duties not found in common law or in equity. *J&J Ventures Gaming, LLC v. Wild, Inc.*, 2016 IL 119870, ¶ 23.

¶ 27    Here, the dispute involves a public employee labor dispute, which is governed by the Public Labor Relations Act. Section 2 of the Public Labor Relations Act provides, in pertinent part: "It is the purpose of this Act to regulate labor relations between public employers and employees, including the designation of employee representatives, negotiation of wages, hours and other conditions of employment, and resolution of disputes arising under collective bargaining agreements." 5 ILCS 315/2 (West 2020). Section 5 confers upon the Illinois Labor Relations Board (Board) jurisdiction over all collective bargaining matters. *Id.* § 5(a-5). Section 8 provides:

> "The collective bargaining agreement negotiated between the employer and the exclusive representative shall contain a grievance resolution procedure which shall apply to all employees in the bargaining unit and shall provide for final and binding arbitration of disputes concerning the administration or interpretation of the agreement unless mutually agreed otherwise." *Id.* § 8.

Finally, the Public Labor Relations Act provides that any CBA executed pursuant to the statute "shall supersede any contrary statutes, charters, ordinances, rules or regulations relating to wages, hours and conditions of employment and employment relations adopted by the public employer or its agents." 5 ILCS 315/15(b) (West 2010).[3]

¶ 28    In accordance with these statutory provisions, this court has repeatedly found that the Board, not the circuit court, has exclusive jurisdiction over disputes concerning CBAs or requiring interpretation thereof. See *Sims*, 2022 IL App (1st) 210890-U; *Cessna v. City of Danville*, 296 Ill.

---

[3]The 2010 version of this statute is cited because the 2014 amendment to this section, along with the entirety of Public Act 98-599 (eff. June 1, 2014) (which reformed the Illinois Pension Code (40 ILCS 5/1-101 *et seq.* (West 2012))), was held unconstitutional in *In re Pension Reform Litigation*, 32 N.E.3d 1, 30 (Ill. 2015). The relevant portion of the 2010 version cited here was unchanged by the 2014 amendment.

App. 3d 156 (1998); *Gantz v. McHenry County Sheriff's Department Merit Comm'n*, 296 Ill. App. 3d 335 (1998); *Stahulak v. City of Chicago*, 291 Ill. App. 3d 824 (1997). This is so because concurrent jurisdiction in the circuit courts would "frustrate the legislature's intent to provide a uniform body of law in the field of labor-management relations to be administered by those who have the required expertise in this area" and would allow for "forum shopping and inconsistent judgments in similar factual settings." *Cessna*, 296 Ill. App. 3d at 168. To this end, the statute requires that members on the Board have "5 years of experience directly related to labor and employment relations in representing public employers, private employers or labor organizations; or teaching labor or employment relations; or administering executive orders or regulations applicable to labor or employment relations." 5 ILCS 315/5(a-5), (b) (West 2020).

¶ 29     Here, plaintiffs argue that their claims against the City are based on the Hiring Plan, a separate agreement from the CBA. According to plaintiffs, their claims do not arise out of the CBA and do not require interpretation of the CBA for resolution; as such, the circuit court does have jurisdiction over their claims as they are not preempted by the Public Labor Relations Act. In response, the City contends that the circuit court's dismissal of the amended complaint was proper because the claims necessitate interpretation of the CBA's terms. The City asserts that the CBA addresses the topic of plaintiffs' claims at length, specifically citing section 9.3 of the CBA as well as the management-rights section. The City also points out that the Hiring Plan itself frequently cites and refers to the CBA. Like the circuit court, the City largely relies on *Sims*, 2022 IL App (1st) 210890-U, a non-precedential order of this court, as well as *Glasper*, 2021 IL App (1st) 200764.

¶ 30     "The ultimate purpose of a CBA is to express the common understanding of the terms and conditions of employment" (*Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 72), and

a CBA "defines the rights and liabilities of the parties subject to the agreement and the manner in which contractual obligations may be enforced" (*Zelenka v. City of Chicago*, 152 Ill. App. 3d 706, 714 (1987)). A CBA is a contract and thus is interpreted in accordance with principles of contract law. *Board of Education of Du Page High School District No. 88 v. Illinois Educational Labor Relations Board*, 246 Ill. App. 3d 967, 975 (1992). "[O]nce a contract containing a valid arbitration clause has been executed, the parties are irrevocably committed to arbitrate all disputes arising under the agreement." *Board of Managers of the Courtyards at the Woodlands Condominium Ass'n v. IKO Chicago, Inc.*, 183 Ill. 2d 66, 74 (1998). "Before an issue can properly be referred to an arbitrator, therefore, the particular dispute must be of the type that the parties have agreed should be submitted to arbitration." *United Cable Television Corp. v. Northwest Illinois Cable Corp.*, 128 Ill. 2d 301, 306 (1989).

¶ 31    Arbitration is favored in Illinois courts, and, generally, "the parties to an agreement are bound to arbitrate only the issues which they have agreed to arbitrate, as shown by the clear language of the agreement and their intentions expressed in the language of the agreement." *Amalgamated Transit Union, Local 241 v. Chicago Transit Authority*, 2014 IL App (1st) 122526, ¶ 20. However, in the context of a public employee labor dispute, "the legislature has reversed the presumption that a particular matter is arbitrable only if the parties expressly agree to submit the matter to arbitration." *City of Rockford v. Unit Six of the Policemen's Benevolent & Protective Ass'n of Illinois*, 351 Ill. App. 3d 252, 256-57 (2004). Rather, as stated above in section 8, all disputes "concerning the administration or interpretation" of the CBA shall be submitted to arbitration "unless mutually agreed otherwise." 5 ILCS 315/8 (West 2020). Accordingly, there is a presumption in favor of arbitration under the Public Labor Relations Act such that "all matters are arbitrable unless the parties agree otherwise." The relevant inquiry then is "whether the parties,

through their written agreement, showed an intent to *exclude* from arbitration the disputed matter." (Emphasis added.) *City of Rockford*, 351 Ill. App. 3d at 257. We note that "[w]hether an arbitration [clause] encompasses a particular issue is to be determined without consideration of the merits of the issue claimed to be arbitrable." *United Cable Television Corp.*, 128 Ill. 2d at 307.

¶ 32    In determining the arbitrability of a dispute, our supreme court has made clear that sometimes that decision may properly lie with the court and other times it may properly lie with an arbitrator, and this issue becomes particularly difficult where the agreement contains a broad arbitration clause. *Donaldson, Lufkin & Jenrette Futures, Inc. v. Barr*, 124 Ill. 2d 435, 444 (1988); see *Salsitz v. Kreiss*, 198 Ill. 2d 1, 9 (2001) (following the approach set forth in *Donaldson*). We recognize that *Donaldson* was not a collective bargaining case, but nothing in the decision reflects an intent to restrict the arbitrability test to commercial cases and several decisions from this court have utilized the following approach in collective bargaining cases. See *Thompson v. Policemen's Benevolent Labor Committee*, 2012 IL App (3d) 110926, ¶ 18; *City of Rockford*, 351 Ill. App. 3d at 256; *Jupiter Mechanical Industries, Inc. v. Sprinkler Fitters & Apprentices Local Union No. 281*, 281 Ill. App. 3d 217, 223 (1996). Where it is clear on the face of the agreement that the parties agreed to arbitrate the issue, the court should order arbitration. *City of Rockford*, 351 Ill. App. 3d at 256 (citing *Donaldson*, 124 Ill. 2d at 449). Where, instead, it is clear that the parties did *not* agree to arbitrate the issue, the court should deny arbitration. *Id.* Finally, "[i]n unclear cases, the question of arbitrability should be referred to the arbitrator." *Id.*; see *Bourbonnais Township v. International Union of Operating Engineers of Chicago, Illinois Vicinity Local No. 399*, 2022 IL App (3d) 210409-U, ¶ 15 (finding that "it is unclear or ambiguous whether [the] dispute falls within the arbitration clause" and must therefore be "referred to the arbitrator to decide arbitrability"); *City of Naperville v. Illinois Fraternal Order of Police, Labor Council, F.O.P.*

*Lodge No. 42*, 2013 IL App (2d) 121071, ¶ 15. This third option is "consistent with the purpose of arbitration, employing the arbitrator's skilled judgment to resolve the ambiguity." *City of Naperville*, 2013 IL App (2d) 121071, ¶ 15.

¶ 33     In the instant case, we conclude that plaintiffs' claims that the City violated promotional procedures are subject to arbitration where it is clear that, when read in conjunction, the CBA, the Hiring Plan, and the Public Labor Relations Act require interpretation and application of the CBA for resolution of plaintiffs' claims, and disputes over promotions and eligibility lists were not specifically excluded from arbitration. In construing a contract, such as the CBA, we must "ascertain and give effect to the intention of the parties," and "[t]he best indication of the parties' intent is the plain language of the contract." *City of Rockford*, 351 Ill. App. 3d at 257.

¶ 34     The CBA, Article X, titled "Grievance Procedure," provides that "[a]ny grievance or dispute which may arise between the parties, including the *application, meaning or interpretation* of this Agreement" must be settled in accordance with the procedure set forth therein (Emphasis added.). This is in accordance with section 8 of the Public Labor Relations Act (5 ILCS 315/8 (West 2020)), which requires such a grievance statement be included in any CBA. To determine whether "application, meaning or interpretation" of the CBA is necessary, we must first examine plaintiffs' claims. Plaintiffs point out that the CBA is not mentioned anywhere in their complaint, and they seek to distill down their specific dispute to whether the City was required to provide a justification for retiring the 2009 eligibility list. Although that may be *an* issue to be resolved, our reading of the amended complaint reveals that the overarching claim is that plaintiffs were improperly passed over for promotions to lieutenant positions. If the only issue to be resolved was that the City did not provide a justification for retiring the list, then the remedy would simply be for the City to provide the requisite justification. Rather, plaintiffs request that, because the City

did not provide a justification, they must be automatically promoted to lieutenant and receive backpay. Clearly, plaintiffs' larger concern is that they were not promoted. The resolution of that issue requires application and interpretation of the CBA, where it specifically includes numerous provisions on promotion procedures.

¶ 35     Section 9.3 of the CBA governs the promotion process and includes numerous provisions that are germane to the dispute here. In particular, it provides that promotions "shall be made from established lists resulting from job related examinations" and "an employee who was passed over on an eligibility list shall be permitted to take the examination and be placed on the eligibility list for the rank above that for which the employee was passed over." As an example, the CBA provides that a firefighter passed over for promotion to lieutenant shall be permitted to take the examination for captain and be placed on the eligibility list for captains. Section 9.3 also states that promotional vacancies shall be filled from the applicable eligibility list and these lists shall be generated by the City following the requisite examination. The City will rank employees on the list according to their scores and shall provide the list to the Union prior to any promotions. According to this section, "[v]acancies will customarily be filled by employees in the order of their ranking on the eligibility list." If an employee is passed over for promotion, that employee shall have his or her name inserted at the top of the new eligibility list in rank order and "shall be promoted from the new eligibility list to vacancies which will customarily be filled by employees in the order of their ranking on the eligibility list." Additionally, section 9.3 requires that a firefighter cannot be promoted to the position of lieutenant without serving 54 months as a firefighter and states that an employee can be passed over for promotion for the following reasons: injury leave, major disciplinary infraction, or compliance with an order of a court, administrative agency, administrative law judge, hearing officer, or arbitrator. Finally, section 9.3 includes a

section on the "performance selection process," which provides that up to 16% of the promotions to the rank of lieutenant may be made by the Fire Commissioner on the basis of performance and then lists the necessary criteria for a performance promotion.

¶ 36 Additionally, in an addendum to the CBA in the form of a letter agreement, the CBA reconfirmed the City and the Union's agreement that, "in the event the City utilizes performance selection promotions from eligibility lists derived from examinations administered after January 1, 1997, the City will forgo making such promotions on the last promotional order before the eligibility list is retired." The City also agreed that "the last promotional order will include at least 16% of the total promotions previously made from that eligibility list, and that the last promotions will be in strict rank order from the eligibility list." It is unclear to this court whether this letter agreement contributed to the underlying conflict regarding promotions and the eligibility lists; however, that only further proves our point that the expertise of the Board should be relied upon in the circumstances before us. See *Semmens v. Board of Education of Pontiac Community Consolidated School District No. 429*, 190 Ill. App. 3d 174, 178 (1989) ("matters which require specialized or technical expertise [should] be decided by a tribunal possessing those qualities").

¶ 37 Based on the foregoing, it is clear to this court that the CBA provides both the method in which eligibility lists are created and firefighters are promoted to lieutenants, as well as the reasons firefighters would not be promoted from the eligibility list and the remedy when firefighters are passed over. In deciding whether the City erred in failing to promote plaintiffs and, if so, what remedy should be available for that error, it is necessary to interpret and apply the provisions of the CBA. See *Walton v. Roosevelt University*, 2022 IL App (1st) 210011, ¶ 22 (CBAs "may include express and implied terms [citation], and it is up to an arbitrator, not a state court, to define the scope of the parties' agreement"); see also *Mahoney v. City of Chicago*, 293 Ill. App. 3d 69,

72 (1997) (though no hiring plan or similar agreement was at issue, this court found that plaintiffs' challenge to "the City's method of filling promotional vacancies" was a question of "the City's compliance with the collective bargaining agreement" and plaintiffs were required to exhaust their remedies under that agreement).

¶ 38    Plaintiffs, nonetheless, contend that it is only necessary for this court to look at the Hiring Plan to resolve their dispute because the Hiring Plan specifically addressed the method in which eligibility lists will be retired and the CBA is "silent" on the matter. Specifically, the Hiring Plan provides:

> "Eligibility Lists may be retired at the discretion of the Fire Commissioner, in consultation with the DHR Commissioner, provided that no Eligibility List shall be used for longer than eight (8) years after it has been established unless there is a lack of available funds for testing and/or low utilization of the Eligibility List due to the lack of promotional opportunities, in which case the Eligibility List will be retired as soon as practicable after funding has been made available for a new examination. The Fire Commissioner's justification for the retirement of the Eligibility List shall be documented in the hiring file."

The Hiring Plan, thus, provides the established practices for retirement of eligibility lists, and those practices are not addressed in such detail in the CBA. However, the Hiring Plan provides no remedy for violation of these retirement procedures, whereas the CBA provides remedies for when a firefighter is passed over for promotion and sets forth the procedure for when new eligibility lists are generated. For those reasons, the CBA would nonetheless need to be consulted in resolving plaintiffs' dispute.

¶ 39    Regardless of whether the Hiring Plan resolves any aspects of plaintiffs' dispute, the Public Labor Relations Act and the CBA, itself, explicitly state that the CBA controls. The Public Labor

Relations Act states that any CBA executed pursuant to the statute "shall supersede any contrary statutes, charters, ordinances, rules or regulations relating to wages, hours and conditions of employment and employment relations adopted by the public employer or its agents." 5 ILCS 315/15(b) (West 2010). The CBA states in Article VI: "This Agreement constitutes the complete and entire Agreement between the parties and concludes collective bargaining (except as provided for in the grievance procedure) for its term. Amendments and modifications of this Agreement may be made by mutual written agreement of the parties to this Agreement." The combined effect of these provisions indicates that the CBA controls over any other contradictory provision in any other source where "wages, hours and conditions of employment and employment relations" are involved and that any additional or modified term must be mutually agreed upon by the parties, *i.e.* the July 30, 2020, letters accompanying the CBA. Notably, promotional procedures affect "conditions of employment," and therefore the promotional procedures in the Hiring Plan, if construed as rules or regulations, are superseded by those in the CBA. See *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 209 (1998) ("a change in the condition of employment *** may also encompass the loss of potential work or promotional opportunities"). Thus, the Union and the City clearly engaged in collective bargaining over the promotion process, and therefore any "separate agreements" exceeding or altering those terms set forth in the CBA are precluded. See *Matthews*, 2016 IL 117638, ¶¶ 100-01 (where the Chicago Transit Authority engaged in collective bargaining over retiree health care benefits, any "implied in fact" agreements or " 'outside' promises" exceeding those terms set forth in the CBA are precluded under Illinois law).

¶ 40 Additionally, as the City points out and the circuit court noted, in sections addressing promotional opportunities, the Hiring Plan expressly references the CBA. Specifically, a section

titled "Use of Eligibility List" provides that all eligible candidates "shall be considered for vacancies in rank order from the applicable Eligibility List *unless otherwise provided for by the CBA*," and a section titled "Performance Selection Process" states that any selections made under this process "shall be made *in accordance with the procedures set forth in the CBA*." This implies that the City intended the Hiring Plan to comply with the CBA and, where contradictory, to be superseded by the CBA. Additionally, the *Shakman* Accord, which prompted the creation of the Hiring Plan, specifically acknowledged the existence of CBAs and the Act and stated that it should be "construed and administered consistent with the Act." Because the Hiring Plan was born out of the Accord and was "fully incorporated [therein] by reference," this also suggests that there was never an intention for the Hiring Plan to control over the Act or any CBA. Accordingly, the CBA controls in this instance, and the dispute should, therefore, be submitted to arbitration in accordance therewith. See *Walton*, 2022 IL App (1st) 210011, ¶ 26 ("When workers unionize and agree to be bound by a collective agreement, they forgo the right to raise some of their grievances on an individualized basis in state court.").

¶ 41    Finally, we find that even if the claims involved the exercise of the City's managerial authority, they would nonetheless be preempted. Article XIV of the CBA provides that the City has the right to "unilaterally determine matters of inherent managerial policy and to implement decisions with respect thereto," including, *inter alia*, the right

"to direct its employees; to determine the content of examinations, the necessary requirements to participate in the examination process, and the minimum qualifications for all positions; *** to maintain and improve efficiency of governmental operations; to determine the methods, means and personnel by which government operations or a unit

thereof are to be conducted; *** and to exercise control and discretion over its organization and the technology of performing its work."

It continues that, even in the exercise of managerial rights, the City must still follow the provisions of the CBA. Notably, claims may still be preempted, even where they arise under the management rights clause in the relevant CBA, which provides an agency with "broad authority" to manage the department, direct the workforce, and set the rules of employment. *Id.* ¶ 22. Thus, even if plaintiffs' dispute falls under "managerial functions," it is nonetheless preempted and should be determined by an arbitrator. See *id.* ¶ 25 (whether the union, either expressly or implicitly, consented to the collection and use of biometric data through the management rights clause is a question reserved for arbitration); *Staunton Community Unit School District No. 6 v. Illinois Educational Labor Relations Board*, 200 Ill. App. 3d 370, 378 (1990) (presence of a management rights clause in the contract did not render the dispute inarbitrable).

¶ 42    The City, and the circuit court below, properly relied on *Sims*, 2022 IL App (1st) 210890-U, for support, as we also find it instructive here. In *Sims*, the plaintiffs (correctional officers employed by defendant, the Sheriff of Cook County) filed a class action lawsuit against the defendant for underpayment of wages in violation of the Illinois Wage Payment and Collection Act (Wage Act) (820 ILCS 115/1 *et seq.* (West 2020)). *Sims*, 2022 IL App (1st) 210890-U, ¶ 2. They alleged that there was an "implicit employment agreement" with the defendant that they would continue to be paid according to a higher pay scale. *Id.* ¶ 9. The circuit court dismissed the claim, finding that it would require analysis of the relevant CBA and was therefore preempted, depriving the court of jurisdiction. *Id.* ¶ 13. On appeal, the plaintiffs argued that their "right to payment" was based on an independent agreement and did not require interpretation of the CBA. *Id.* ¶ 17. This court affirmed the circuit court's dismissal, finding that "the claim raised by the

plaintiffs cannot be resolved without undertaking some substantive interpretation of the terms of the applicable CBA." *Id.* ¶ 22. The court also rejected the plaintiffs' attempt to overcome preemption with its allegation of a separate and independent "implied agreement" because "for a court even to resolve the issue of whether an implied agreement existed that was independent of the CBA and controlled over the express terms of the CBA addressing the same subject matter, the court would have to interpret the terms of the CBA." *Id.* ¶ 23.

¶ 43     Plaintiffs here do not argue that there is an implied agreement, as in *Sims*; instead, they assert that the Hiring Plan is a separate written agreement that governs all aspects of the promotion process and eligibility lists. Notwithstanding this distinction, we nonetheless are guided in our analysis by the reasoning in *Sims*. The disputed issue here involves the promotional process, which is laid out in the CBA, and, thus, necessarily involves interpretation of the CBA's terms. Additionally, the enforceability and applicability of any practices and procedures set forth in the Hiring Plan would nonetheless require interpretation of the CBA's terms—for instance, whether the CBA permits separate agreements on the issue of promotions and, if so, whether the procedures in the Hiring Plan conflict with those in the CBA. See *Amalgamated Transit Union, Local 308 v. Chicago Transit Authority*, 2012 IL App (1st) 112517, ¶¶ 16-18 (finding that, any action on the negotiated side agreement, including its validity and the parties' intent, "would necessarily involve interpretation of the CBA" and "examination of the customs and practices of the workplace that the CBA governs *** to maintain consistency and fairness); *Jones v. Caterpillar Tractor Co.*, 241 Ill. App. 3d 129, 137 (1993) (finding that, in determining whether the plaintiffs' termination violated the apprenticeship agreement, "the nature of the relationship between the apprenticeship agreement and the [CBA] must necessarily be examined"); *Schacht v. Caterpillar, Inc.*, 213 Ill.

App. 3d 169, 175 (1991) (finding that the apprenticeship agreements were made within the context of the CBA and the plaintiffs' employment nonetheless remained subject to the CBA).

¶ 44    Similarly, in *Glasper* , 2021 IL App (1st) 200764, ¶¶ 4, 13, the plaintiff was employed by the defendant as a janitor at the airport; was a member of a union, which was covered by a CBA; and alleged a breach of contract claim as to an "implied" agreement, as well as a claim under the Wage Act. The circuit court dismissed the complaint because the claims were preempted. *Id.* ¶ 24. The Sixth Division of this court affirmed, finding that the CBA was the controlling agreement, where the Wage Act "must give deference to the CBA" and "[t]he fact finder would have to refer to the CBA" to resolve numerous questions regarding wages and overtime pay. *Id.* ¶¶ 43-51; see *Tito v. Scrub, Inc.*, 2021 IL App (1st) 201081-U, ¶ 27 (following *Glasper* and finding that "no 'implied' agreement regarding the same terms can exist where a written agreement between the parties was in place"). Additionally, in *Glasper*, the court pointed out that the CBA prohibited the plaintiffs from negotiating or creating contracts independent of the CBA and thus any alleged implied contract violated the CBA. *Glasper*, 2021 IL App (1st) 200764, ¶ 40; see *Tito*, 2021 IL App (1st) 201081-U, ¶ 28. Based on a plain reading of the CBA, we, like the panels in *Glasper* and *Tito*, conclude that independent agreements are not authorized and, in any case, the terms of the Hiring Plan would nevertheless need to defer to the CBA.

¶ 45    The court in *Sims*, as well as the circuit court, rejected some of the same cases on which plaintiffs rely for support. We, too, find those cases inapposite for the following reasons.

¶ 46    *Daniels v. Board of Education of Chicago*, 277 Ill. App. 3d 968 (1996), and *Byrne v. Hayes Beer Distributing Co.*, 2018 IL App (1st) 172612, are distinguishable, as they involved disputes that the associated CBAs did not reach. Instead, the precise subject matter in those cases were expressly and solely governed by statute, specifically the Wage Act. See *Sims*, 2022 IL App (1st)

210890-U, ¶¶ 26-27 (distinguishing *Daniels* and *Byrne*). In *Daniels*, the plaintiffs sought compensation for vacation days accrued but not taken during their former employment with the Board of Education of the City of Chicago, and their claim was brought pursuant to the Wage Act. 277 Ill. App. 3d at 968. The circuit court dismissed the complaint for lack of subject matter jurisdiction, as the plaintiffs failed to exhaust remedies under the CBA. *Id.* at 970. The Sixth Division of this court reversed, finding that the Wage Act specifically addressed "compensating former full-time employees for accrued vacation days," whereas the CBA did not. *Id.* at 974. In *Byrne*, the Teamsters Union and the defendant, Hayes, a beer distributing company, entered into a CBA governing delivery drivers, but the plaintiff driver's claims "derived solely" out of the Wage Act and did "not require interpretation of any provision of the CBA." 2018 IL App (1st) 172612, ¶¶ 5, 32. Although the CBA addressed "drivers' duties to rotate product to maintain freshness[,]" it did not describe "how that provision [would] be enforced and whether [the defendant] [could] deduct from drivers' compensation for stale beer." *Id.* ¶ 35. Thus, the plaintiff was not required to exhaust contractual remedies. *Id.* ¶ 36.

¶ 47     Here, plaintiffs are not seeking to enforce a statutory right that is not covered by the CBA; rather, they allege that the City was required to utilize a certain eligibility list and to promote firefighters in accordance with a particular procedure, set forth in the Hiring Plan, which is separate from the CBA but is not a statute. Moreover, in contrast to *Byrne* and *Daniels*, the CBA is *not* silent on the issue of promotion procedures and whether the procedures set forth in the Hiring Plan are enforceable or applicable requires the interpretation of the CBA. Thus, neither case is applicable here. We similarly reject *Semmens*, 190 Ill. App. 3d at 176-77, on which plaintiffs also rely, where arbitration was denied as the teachers claimed that they had been unlawfully denied a

lunch period and the relevant CBA had a section entitled "Lunch Period," which was completely blank.

¶ 48    Plaintiffs additionally rely on *Lodge No. 822, International Ass'n of Machinists & Aerospace Workers Union v. City of Quincy*, 137 Ill. App. 3d 425 (1985), and *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482 (1987), which we also find inapposite. In *Lodge No. 822*, the Union requested that the circuit court direct the City to resolve a dispute through arbitration and cited a "Working Agreement" for support of their complaint. *Lodge No. 822*, 137 Ill. App. 3d at 425. The Fourth District of this court recognized that arbitration clauses in CBAs are to be given a broad interpretation, but, nonetheless, "the mere existence of a dispute between the employer and the collective bargaining representative of the employees is insufficient to make the matter in dispute subject to arbitration." *Id.* at 429. The court also stated that "some nexus between the dispute and the provisions of the agreement is necessary." *Id.* at 431. Ultimately, the court concluded that the employees' claims were not preempted, noting that "[t]he agreement contains nothing about the propriety of hiring temporary workers." *Id.* at 430. The circumstances before us, however, do not present the "mere existence of a dispute" between the City and the Union. Rather, plaintiffs' dispute involves promotional procedures that are addressed in detail in the CBA, *i.e.*, a nexus.

¶ 49    In *Duldulao*, the plaintiff alleged that the defendant terminated her employment in violation of procedures set forth in an employee handbook, which she argued "created enforceable contractual rights," and the circuit court granted summary judgment in favor of the defendant. *Duldulao*, 115 Ill. 2d at 484. Our supreme court affirmed the appellate court's reversal of the circuit court's decision and held that the handbook did create "an enforceable right to the particular disciplinary procedures described therein." *Id.* at 490. Notably, there was no other agreement or

any applicable statute that related to the plaintiff's employment. Our decision would obviously be different if the *sole* document addressing promotions, or rights of firefighters in general, was the Hiring Plan, but that is simply not the case. As such, *Duldulao* has little bearing here.

¶ 50    Our conclusion that arbitration is appropriate here is bolstered by the grievances filed by many of the class action plaintiffs, wherein they asserted that the City violated the CBA. Specifically, it appears that nearly all of the grievance reports in the record filed by individual plaintiffs cited section 9.3 in arguing that there was a violation of the CBA. Interestingly, the City repeatedly denied arbitration under the guise that plaintiffs' claim did not implicate the CBA; however, now, the City requests that this court affirm the trial court's dismissal of this matter because it should be resolved via arbitration. It seems to us, then, that plaintiffs initially sought arbitration for resolution of their grievances and the City now claims arbitration is the correct forum. Thus, both parties should be satisfied with our conclusion that plaintiffs' recourse for their grievances should be through the arbitration process. We recognize that this decision may implicate concerns of "judicial economy, duplication of effort, or possibly inconsistent result," but those concerns are outweighed by Illinois public policy's preference for arbitration in labor disputes. *Bass v. SMG, Inc.*, 328 Ill. App. 3d 492, 507 (2002).

¶ 51    Finally, where an agency has exclusive jurisdiction to hear an action, as we have determined here, parties must exhaust all administrative remedies before seeking relief in the courts. *Employers Mutual Cos. v. Skilling*, 163 Ill. 2d 284, 288 (1994). A plaintiff's complaint must allege on the face of the pleading that grievance procedures were followed and exhausted. *Cessna*, 296 Ill. App. 3d at 165. As the City points out, plaintiffs have not exhausted all administrative remedies before turning to the courts for review, and plaintiffs do not allege that they have done so. As such, the circuit court's dismissal was proper.

¶ 52 Because we have determined that dismissal of the amended complaint was proper due to a lack of subject matter jurisdiction, pursuant to section 2-619, it is not necessary for this court to address any of the arguments arising under section 2-615.

¶ 53                                    III. CONCLUSION

¶ 54 For the reasons stated, we affirm the judgment of the circuit court.

¶ 55 Affirmed.

***Barron v. City of Chicago*, 2025 IL App (1st) 240066**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-CH-8557; the Hon. Claire J. Quish, Judge, presiding. |
| **Attorneys for Appellant:** | Ruth I. Major, Law Offices of Ruth I. Major, P.C., of Chicago, for appellants. |
| **Attorneys for Appellee:** | Mary B. Richardson-Lowry, Corporation Counsel, of Chicago (Myriam Zreczny Kasper, Suzanne M. Loose, Daniel E. Alperstein, and Julian N. Henriques, Jr., Assistant Corporation Counsel, of counsel), for appellee. |